UTAH ALLOY ORES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 67258. Filed February 18, 1960.

*David A. Johnston, Jr., Esq.*, for the petitioner.
*Hubert E. Kelly, Esq.*, for the respondent.

TIETJENS, *Judge:* The respondent determined deficiencies in income taxes for the calendar years 1952, 1953, and 1954 in the amounts of $546.40, $676.38, and $22,548.19, respectively. There are two issues for decision. These are whether (1) the economic interest in the ore in place is to be shared between petitioner and the miners of the ore for purposes of computing the depletion allowable to petitioner, and (2) whether hauling allowances paid by the purchasers of the ore are part of the gross income from the property. Certain facts are stipulated. The petitioner's tax returns were filed with the director of internal revenue at Columbus, Ohio.

FINDINGS OF FACT.

The stipulated facts are incorporated by reference.

The petitioner is a corporation organized in 1936 under the laws of Ohio. Its address is in Columbus, Ohio. In the years 1952, 1953, and 1954 it was the owner of 106 mining claims in Grand County, Utah, which were acquired at various times prior to 1952. These are in areas known as the Yellow Cat Mining District and the Gladstone Mining District. Most of the claims are on land owned by the United States; the remainder are on land owned by the

State of Utah. They are described as unpatented claims, and are transferable by deed. The owner has the right to extract any ore in the land. The claims are usually rectangular in shape and measure 1,500 feet by 600 feet on the surface of the land. The ore extracted from these claims is carnotite, which contains uranium oxide and vanadium oxide. The mining and sale of these ores is controlled by the Atomic Energy Commission, hereinafter referred to as the Commission. There is no free market for these ores and they must be delivered to a processing plant designated by, and at a price fixed by, the Commission. The petitioner held a license issued by the Commission permitting it to sell these ores.

The petitioner had no full-time employees in Utah in the taxable years. It had part-time employees for certain work upon its claims.

The petitioner arranged for the mining of ore from its claims pursuant to written leases with individuals. The leases were usually for a term of 1 year, and provided:

LESSEE agrees to mine said Claim regularly and produce saleable ore therefrom containing more than 0.10% U308 and complying with U. S. V.'s requirement that value of ore per ton per scheduled prices shall be at least $15.25 per ton. Mining work shall be done safely in a proper and minerlike manner. All ore shall be mined therefrom as it exists, and no ore shall be selected or mined for higher than its average grade, except to obtain the minimum grade above described.

IT IS UNDERSTOOD that all ore produced shall be delivered to LESSOR for sale to U S V Co at its receiving Depot at Thompsons, Utah, or other authorized place, or to U S A E C's Agent at Monticello, Utah, Receiving Depot, or such other Depot, or to such other ore purchaser, as may be mutually agreed upon by the parties hereto, and that upon receipt by LESSOR of settlement for such ore, the LESSOR shall pay to LESSEE the balance of all amounts and including "Development Allowance", (but excepting "Hauling Allowance"), received by LESSOR for such ore, after retaining and deducting from the gross amount received, as aforesaid, THIRTY THREE & ONE THIRD PER CENT THEREOF, (33⅓%), and also additional hauling charges, as provided below, and an amount for Utah State Insurance Fund Insurance for LESSEE (and HIS employees if any), LESSEE requesting such insurance under LESSOR's Insurance Contract. Ore under grade above specified shall have no value in settlement between the parties hereto. The amounts received for settlement for such ore, as herein described above, apply to and include only settlement by ore purchaser at Scheduled sale prices, and does not include or refer to any amounts, if any, which might hereafter be received by LESSOR on account of what is known as Bonus Payments.

LESSEE shall maintain and care for all mining equipment which may now be located on said Mining Claim, and shall furnish all other necessary mining equipment and mining supplies; shall mine ore for hauling and load it in full truck loads (and in not less than ten ton lots if so required), and same shall be billed for LESSOR's account for delivery to such purchaser aforesaid.

The Lessor shall furnish Truck To haul such ore from such claim to the Receiving Depot of U S V at Thompsons, or other Depot as above described, and LESSOR shall be paid out of the proceeds of such ore and the A E C Hauling Allowance for such hauling at Commercial Rates, that is to say, $3.00 per

ton for any mileage haul under twenty miles, together with 15¢ per ton mile for any additional mileage over said 20 mi.

LESSEE shall load said ore or Lessor's Truck for the purpose of such hauling at point on said Mining Claim suitable and proper for hauling out by Truck. In case more than Lessor's trucks are required for ore hauling or in case Lessor's Truck is not available, LESSEE may do such hauling or cause it to be done at Commercial rates and the A E C. Hauling Allowance will apply accordingly. Above hauling rates apply only to Thompsons. In other cases parties will agree as to same.

IT IS UNDERSTOOD AND AGREED that Lessee is an independent Contractor, Lessee; that Lessor acts as agent of Lessee in the Billing and sale of said ore as provided herein and that amounts received by LESSOR over and above amounts paid to LESSEE, as herein provided, constitute the sole and only payments hereunder by LESSEE as payment for this lease and the mining of such ore as aforesaid. The amounts received as above and as used in calculation of settlement with Lessee hereunder shall be calculated without reference to any enrichment by any other ore sold at the same time by LESSOR.

FURTHER, LESSOR, agrees to make suitable cash advances, prior to final settlement, to LESSEE against any ore delivered, as such cash advance is required by LESSEE for such necessary mining operations hereunder; it is also understood that any ore delivered hereunder shall at the discretion of LESSOR be delivered and sold to such purchaser at Receiving Depot along with other ores of the Lessor, settlement with LESSEE to be calculated according to schedule of prices for purchase of ore per A. E. C. schedule,

FURTHER, LESSOR shall have the right to enter upon said Mining Claims during the term hereof for inspection of same.

IT IS FURTHER UNDERSTOOD AND AGREED that in consideration of granting hereof, and the resulting acquisition by LESSEE of information as to ore bodies by LESSEE and his employees, if any, while entering upon and working said leased property, as to such general area, that if the Lessee or Lessees as the case may be, or any of his employees, shall at any time within two years from date hereof, or date of renewal hereof, make discovery of mineral deposits, in Tp., 21, 22 and 23, S in both Ranges 21, 22, and 23, E S L M, then, when, as & if restrictions are lifted on same by the Government, mining claims shall be located accordingly in name of LESSOR and Lessor thereupon agrees to pay to and compensate LESSEE, in reasonable amount, for services in such discovery and location.

This lease shall terminate upon notice by LESSOR in event LESSEE shall fail to work said Mining Claim regularly and thereupon, or at the end of the term hereof, said LESSEE shall surrender said property to LESSOR, and in either of such events the LESSOR may, with or without legal process re-enter upon said property and the same have again and possess as in its first and former estate. LESSOR shall have the right to enter at any time for inspection of said claims and workings thereon and for prospecting and drilling, or other development. This lease shall terminate as aforesaid upon notice by LESSOR in event Lessee shall abandon this lease, or fail to work said Mining Claims regularly and deliver ore with reasonable regularity or shall fail to proceed with such assessment work, as specified, and in either of such events LESSOR may re-enter as above provided. * * *

The miners were referred to as "leasers."

The miners were individuals and in some instances a lessee had partners or associates or employees working with him. None of the miners had a license from the Commission.

A bin was placed on each claim for storage of the ore until hauling. The ore was hauled to the U.S. Vanadium Company plant at Thompsons, Utah, or to the Climax Uranium Company at Grand Junction, Colorado.

The processors paid the petitioner for the ore received. The petitioner computed the amounts due the leasers and remitted to them the amounts due.

The Commission granted a hauling allowance for transporting ore to the processing plant. In the taxable years this was 6 cents per mile for the distance from the claim to the plant. In some cases the allowance was not sufficient to cover the actual cost and the petitioner charged the leasers for the excess cost. The petitioner carried workmen's compensation insurance and arranged to include its leasers in this coverage, deducting the cost from the proceeds of the ore.

The petitioner used a core drill for prospecting for ore, and furnished mine cars and rails, hoists for the cars, and jackhammers for drilling, which were available for the miners' use. The miners also furnished tools of their own. The petitioner provided bunkhouses on or near the claims for use of the miners, and a truck for hauling ore to the processing plants.

None of the leased claims has been mined to exhaustion. When a lessee relinquished his lease or failed to renew it, the petitioner obtained a release of the claim.

Each year the petitioner filed with the county recorder a proof of labor on mining claims, certifying that work was done on each claim in excess of $100.

In the year 1954 petitioner had 19 leases in effect with 13 lessees and involving some 20 of its claims. Except for certain leases mined by Charles Cato, the gross proceeds from ore from each lease ranged from about $100 to nearly $10,000, and the net amounts paid the lessees ranged from $45.40 to about $5,000.

Cato and his associates mined three leases in 1954 and received proceeds of approximately $128,000.

The lessees made no rental payments to the petitioner except through sale of the ore. In some cases the petitioner advanced loans to lessees which were repaid by charging them against the proceeds of the ore.

OPINION.

The petitioner received the proceeds of the sale of ore mined by its lessees, retained one-third for itself, and paid over two-thirds, less certain charges, to the lessees pursuant to the terms of the leases. The petitioner contends that it is entitled to the deduction for percentage depletion provided under sections 23(m) and 114(b)(4) of the Internal Revenue Code of 1939 and sections 611 and 613 of the

Internal Revenue Code of 1954 measured by the entire amounts received for the ore. The respondent determined that the petitioner was not entitled to depletion upon the amounts paid over to the lessees, holding that the lessees had an economic interest in the mining claims and that the petitioner's "gross income from the property" did not include such amounts.

Section 611, applicable in 1954, directs that a reasonable allowance for depletion shall be made in the case of mines and that in "the case of a lease the deduction shall be equitably apportioned between the lessor and lessee." Section 23(m), applicable in 1952 and 1953, is similar. Section 613 fixes the rate for uranium and vanadium at 23 per cent of the "gross income from the property." Section 114 (b)(4) is similar, except that the rate allowed for these minerals is 15 per cent.

The question for decision turns upon whether the miners had an economic interest in the ore in place. In *Palmer* v. *Bender*, 287 U.S. 551 (1933), the depletion allowance was construed as applicable in—

every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for the return of his capital. * * * It is enough if by the leasing transaction he has retained a right to share in the oil produced. If so, he has an economic interest in the oil, in place, which is depleted by production.

The term "economic interest" does not extend to a mere economic advantage derived from production through a contractual relation to the owner by one who has no capital investment in the mineral deposit. *Helvering* v. *Bankline Oil Co.*, 303 U.S. 362 (1938).

The petitioner relies on *Parsons* v. *Smith*, 359 U.S. 215 (1959), in which the Supreme Court held that certain strip miners of coal did not have an economic interest in the mineral extracted.

The respondent contends that the present case is clearly distinguishable from *Parsons* and is not controlled thereby. These leases were for a period of 1 year, were usually renewed, and were cancelable only for cause if the lessee failed to work the claim or comply with the conditions stated. Also the miners received a percentage of the price paid for the ore rather than a fixed price per ton. Furthermore, the miners did what is called "development work" to maintain and increase the developed reserves of uranium ores for which the Commission allowed an additional sum in the price paid on delivery of satisfactory ore. This allowance was also divided two-thirds to the miner and one-third to the petitioner.

In the *Parsons* cases the miners were the petitioners and argued that they acquired an economic interest in the coal in place which was depletable by production. The Supreme Court commented:

We take a different view. It stands admitted that before and apart from their contracts, petitioners had no investment or interest in the coal in place. Their asserted right to the deduction rests entirely upon their contracts. Is there anything in those contracts to indicate that petitioners made a capital investment in, or acquired an economic interest in, the coal in place, as distinguished from the acquisition of a mere economic advantage to be derived from their mining operations? We think it is quite plain that there is not.

By their contracts, which were completely terminable without cause on short notice, petitioners simply agreed to provide the equipment and do the work required to strip mine coal from designated lands of the landowners and to deliver the coal to the latter at stated points, and in full consideration for performance of that undertaking the landowners were to pay to petitioners a fixed sum per ton. Surely those agreements do not show or suggest that petitioners actually made any capital investment in the coal in place, or that the landowners were to or actually did in any way surrender to petitioners any part of their capital interest in the coal in place. Petitioners do not factually assert otherwise. Their claim to the contrary is wholly based upon an asserted legal fiction. As stated, they claim that their contractual right to mine coal from the designated lands and the use of their equipment, organizations and skills in doing so, should be regarded as the making of a capital investment in, and the acquisition of an economic interest in, the coal in place. But that fiction cannot be indulged here, for it is negated by the facts.

The Court pointed out that the capital investment of the miners was in equipment, not in the mineral, that this investment was recoverable through depreciation, that the owner did not agree to surrender and did not actually surrender any capital interest in the mineral in place, that the mineral extracted belonged to the owner, and that the miners were required to deliver it to the owner. All these factors are found in the present case. There are some differences. The contracts in *Parsons* were terminable without cause on short notice and the miners were paid a fixed sum per ton of mineral delivered; while here the contracts were for a term of 1 year (unless the miner failed to work the claim) and the miners received a percentage of the sale price of the ore and thereby assumed some of the risk of the market. The term of 1 year, however, was not sufficient to mine the claims to exhaustion. The miners' right to share in the selling price was by virtue of the contract providing compensation for services and not by reason of any investment in the ore. It was a personal covenant, as in *Helvering v. O'Donnell*, 303 U.S. 370 (1938). The petitioner owned these claims, made the only investment in the minerals, entered into contracts for the extraction and delivery of the ore to it, and had the only license to dispose of the ore and to receive the price fixed by the A.E.C. The petitioner's investment alone suffered depletion from extraction of the ore. There is nothing in this arrangement to indicate that the miners made any capital investment in the mineral in place, which investment suffered depletion. We agree with the petitioner that this case falls within

the ambit of *Parsons* v. *Smith, supra,* and that the miners did not acquire an economic interest in the minerals in place. See *Nathan Fink,* 29 T.C. 1119 (1958). See also *United States* v. *Stallard,* 273 F. 2d 847 (C.A. 4, 1959), where the Court of Appeals applied the *Parsons* case and held that strip miners had no depletable economic interest. The petitioner is entitled to depletion based upon the full price paid for the ore.

The second issue is whether the hauling allowance received by the petitioner for transporting the ore to the processing plants is includible in "gross income from the property" for the purpose of computing depletion.

In the case of mines, gross income from the property means "gross income from mining," and the term "mining" includes treatment to obtain a commercially marketable product and transportation to the plant or mill where ordinary treatment processes are applied, not in excess of 50 miles. Sec. 613(c)(1) and (2), Code of 1954; sec. 114(b)(4), Code of 1939.

Courts have held that the depletion base to be used is the sale price of the first commercially marketable mineral product or products, provided that the processes applied, which are of a manufacturing nature, rather than a mining nature, are the processes normally applied by mine owners to obtain such product. *Commissioner* v. *Iowa Limestone Co.,* 269 F. 2d 398 (C.A. 8, 1959), affirming 28 T.C. 881. Thus there is involved the question of what processing is normally undertaken by a mine owner or operator. to obtain a commercially marketable product.

In order for the transportation to be a part of the "gross income from mining," it must be from the point of extraction to the plant where ordinary treatment processes are applied so that the mineral will become commercially marketable. *Winnsboro Granite Corporation,* 32 T.C. 974 (1959).

In the present case we have no evidence of what processes are applied or what articles are produced in the processing plants to which this ore is delivered. There is no indication that the petitioner's agents have knowledge of what is done or produced. There is no processing undertaken by the petitioner and as far as it is concerned its ore as extracted from the ground is its first commercially marketable product. Under these circumstances the transportation is not necessary to the obtaining of a commercially marketable product and the allowance made for such transportation is not includible in the base for computing depletion.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

MURDOCK, *J.*, dissenting: The miners were not employees of the petitioner and are described in their agreement with the petitioner as independent contractors. That agreement gave the miners rights to mine for a definite term. It provided that the petitioner should act as agent for the miners in selling the ore to the Government and the petitioner could retain, as payment from the miners for the agreement, one-third of the price collected on behalf of the miners. Thus, only the amount retained by the petitioner was its "gross income from the property," the measure for percentage depletion to the petitioner. The Commissioner has allowed the petitioner percentage depletion based upon one-third of the income from the property, thus conceding an economic interest in the property. However, the petitioner has the burden of proving its right to a larger deduction. The record does not show any investment in the ore in place by the petitioner or the terms of the agreement with the Government under which the petitioner acquired alleged rights to the ore in place. Thus the terms of that agreement cannot be compared by the Court with those of the agreement between the petitioner and the miners. This record does not justify a finding that the petitioner did not transfer to the miners by their agreement a part of whatever economic interest the petitioner had in the property. I do not believe the petitioner has shown that it is entitled to percentage depletion based upon the entire amount which the Government paid for the ore.

TURNER and WITHEY, *JJ.*, agree with this dissent.