*Decisions will be entered under Rule 50.*

WALTER BERNARD McCALL AND MARIE S. McCALL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SAM G. McCALL AND RUTH W. McCALL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 85762, 85763. Filed January 12, 1962.

*John Y. Merrell, Esq., K. William O'Connor, Esq.*, and *R. Carl Counts, CPA*, for the petitioners.

*Charles C. Shaw, Jr., Esq.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioners' income taxes, as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 85762 | Walter Bernard McCall and Marie S. McCall | 1956 | $2,773.68 |
| 85763 | Sam G. McCall and Ruth W. McCall | 1956 | 3,044.75 |

The issues in these consolidated cases are (1) whether a prior decision of this Court involving the year 1952 forecloses, under the doctrine of collateral estoppel, the litigation on the merits of the depletion issue involving the year 1956; and (2) whether petitioners, operating as a partnership, are entitled to a depletion deduction for the year 1956.

### FINDINGS OF FACT.

Some of the facts have been stipulated and they are herein incorporated by this reference.

Walter Bernard and Marie S. McCall, husband and wife, are residents of Cedar Bluff, Virginia. They filed a joint income tax return for 1956 with the district director of internal revenue, Richmond, Virginia. Sam G. and Ruth W. McCall, husband and wife, are residents of Richlands, Virginia. They filed a joint income tax return for 1956 with the district director of internal revenue, Richmond, Virginia. Walter and Sam will hereinafter sometimes be called the petitioners.

In 1956 the petitioners, together with George W. McCall, Jr., were general partners in Rebecca Coal Company, a Virginia partnership, engaged in the business of coal mining. Rebecca Coal Company kept its books on an accrual and calendar year basis of accounting.

Norma Mining Corporation, hereinafter called Norma, was organized under the laws of Virginia in 1949. Under a lease dated November 1, 1949, Norma, as lessee, acquired from the Youngstown Mines Corporation, Interlake, Inc., and Stelco Coal Company, as lessors, the exclusive right of mining and removing coal from, in, upon, and under certain tracts of land in Tazewell County, Virginia, for a period of 20 years. Under the lease, hereinafter called the Youngstown lease, it was provided, in part, as follows: (1) Norma would pay to lessors a royalty of 15 cents per ton of coal mined from the leased premises plus 10 percent of the gross selling price realized by Norma in any preceding quarter as might exceed $5 per ton, with an obligation on the part of Norma to make certain minimum annual royalty payments; (2) Norma was required to proceed with diligence to mine, remove, and ship coal and at all times to open, develop, and keep up its operation; (3) Norma and its independent contractors were required to mine the coal in accordance with plans submitted in advance by Norma to the lessors; (4) Norma was required to make surveys, prepare maps and plans, and give directions and courses for all mining operations, entries, airways, rooms, and other mine workings; (5) Norma was required to keep accurate records of coal mined and shipped, and the prices realized by Norma; and (6) penalty royalties would be imposed upon Norma for any coal which it was obligated to mine under the lease but which was not mined during the term of the lease.

G. W. McCall, Sr., has been general manager of Norma since its organization. After the Youngstown lease was executed, he examined the terrain and selected 11 sites as suitable for mine entrances. With the use of hired equipment, Norma then removed rocks and

built roads to the 11 designated entrances, and faced up the coal so that contractors could put in drift mouth openings for mining and build chutes for handling the coal. Norma also designated the areas to be covered by each mine entry. A standard contract form was then prepared by Norma for use with the prospective contractors.

On May 1, 1950, Sam G. McCall, George W. McCall, Jr., and Marvin C. Whitt, operating as a partnership called the M. and W. Coal Company, entered into a contract with Norma to mine coal on one of the tracts of land. On October 1, 1951, Walter Bernard McCall purchased the equity of Marvin C. Whitt in the partership and as of that date the name of the partnership was changed to Rebecca Coal Company. From October 1, 1951 through 1956, petitioners and George W. McCall, Jr., as partners in Rebecca Coal Company, mined coal from the designated area under the May 1, 1950, contract with Norma.

Under the May 1, 1950, contract, which specified that Norma "has the exclusive right of mining and removing coal from the Upper Seaboard Seam in, upon and under certain tracts of land * * * in Tazewell County, Virginia," and that the M. & W. Coal Company "desires to obtain from [Norma] the right to do and perform all work, and furnish all labor, materials, apparatus (including tipples, chutes, docks, outbuildings and/or other similar necessary structures), machinery, tools and supplies, to mine and remove, transport and place in the tipple or screening plant of [Norma], all the coal from said Upper Seaboard Seam in, upon and under that portion of said tracts of land designated as Mine or Parcel No. 1," the M. & W. Coal Company agreed, in part, to do the following: (1) Drive an entry into the seam at the designated place and to mine, by deep-mining methods all coal in said seam over a certain thickness; (2) mine the coal so as to produce the greatest quantity of lump coal possible and deliver it to the screening plant or tipple of Norma, unless otherwise directed by Norma; (3) conduct all mining operations in accord with the terms of the Youngstown lease, except as modified in the May 1, 1950, contract; (4) do all necessary work and provide all necessary materials, apparatus, and labor for the mining operation; (5) produce a minimum of 50 tons of coal under normal conditions; (6) timber the mine and repair old timbering; (7) keep in repair the road and roadways from the mine to Norma's screening plant or tipple; (8) lay and construct all necessary mining tracks; (9) keep the mine drained and free from obstruction; (10) permit Norma to enter and inspect the premises; (11) comply with all mining and other applicable laws both State and Federal; (12) carry workmen's compensation insurance and public liability insurance; (13) pay taxes and assessments of every kind including, but not limited to, excise, privilege, or license taxes, that may be levied upon the privilege of mining coal and/or

the property of M. & W. Coal Company on the premises, or the income accruing to it, all social security (including unemployment compensation) and withholding taxes, and certain payments into welfare and/or pension funds; and (14) not to assign the contract, or any interest thereunder, without Norma's written assent.

Under the same contract Norma agreed, in part, to do the following:

[To pay to the M. & W. Coal Company] the sum of $4.00 per ton of 2,000 lbs, for all coal so mined and delivered * * * but said amount shall be subject to change, by mutual agreement of the parties hereto, as the coal market fluctuates, from time to time hereafter; such payments to be made at the office of [Norma] on Saturday of each week for all coal so mined and delivered during the preceding week, and based on weights at scales of [Norma]. It is expressly understood that the foregoing compensation shall be and constitute the full and complete payment and compensation to the [M. & W. Coal Company] for performing and doing all the work hereunder, for providing all the necessary materials, apparatus (including tipples, chutes, docks, outbuildings and/or other similar necessary structures), machinery, tools, and supplies, and for furnishing all the necessary labor, under this Contract; and said compensation shall not, in any manner, be increased by reason of the [M. & W. Coal Company] being, or becoming, liable for the payment of any assessments, contributions or payments of any nature, in, to or for any benefit, welfare and/or pension fund or funds for the benefit of the employees of the [M. & W. Coal Company] * * *

In addition, the May 1, 1950, contract contained the following provisions:

(B) The period for the duration of this contract is co-extensive with the term of the aforesaid Lease from the Youngstown Mines Corporation, et als., to Norma Mining Corporation, but either party hereto may terminate this Contract, without cause, after thirty (30) days notice, in writing, to the other party, of his or its intention so to do.

(C) Upon the expiration of the term hereof, or upon the termination hereof as hereinabove (paragraph (B), supra) provided, [M. & W. Coal Company] shall have the right, for 20 days, to remove from said mine and premises, all materials, apparatus, machinery, tools and supplies which he has placed, or used, therein or thereon, EXCEPT tipples, chutes, docks, outbuildings or other similar structures, all underground timbering, and such other supports and structures as are necessary for the preservation of the mine or maintenance of embankments; it being expressly understood and agreed that all such tipples, chutes, docks, outbuildings, or other similar structures, and all underground timbering and such other supports and structures as above mentioned, shall, on such expiration or termination of the term hereof, remain in and on said mine and premises and become the absolute property of [Norma], without any compensation, cost or payment therefor whatsoever.

(D) Upon the violation or breach by [M. & W. Coal Company] of any of the covenants herein contained, to be observed and performed by [M. & W. Coal Company], the term of this Contract, at the option of [Norma], shall expire, and the Contract shall immediately become forfeited to [Norma], who may thereupon demand immediate possession of, and reenter upon, the said mine and premises, and dispossess all persons occupying the same, with or without force, and with or without process of law; and [Norma] shall have a lien upon,

and the absolute right to retain possession of, all the materials, apparatus, machinery, tools and supplies of [M. & W. Coal Company] that are in or upon said mine or premises, until all damages and other claims arising out of any and all violations and breaches thereof and any and all other indebtedness owing by [M. & W. Coal Company] to [Norma], shall have been fully compensated for and satisfied by [M. & W. Coal Company] ; and the costs and expenses incurred by [Norma] in storing or preserving such materials, et cetera, until such damages, claims and/or indebtedness has been full compensated for and satisfied, shall be paid by [M. & W. Coal Company].

(E) That, whenever, during the tenure of this Contract, by reason of economic conditions or otherwise, [Norma] is unable to sell or otherwise dispose of, at a reasonable profit, the coal produced hereunder by [M. & W. Coal Company], [Norma] shall have the right to require the suspension of further mining of coal by [M. & W. Coal Company] by giving at least 24 hours' notice, in writing, thereof, to [M. & W. Coal Company], whereupon [M. & W. Coal Company] shall suspend the mining of, and shall produce no more, coal until authorized so to do by [Norma].

(F) That [Norma] hereby expressly reserves the right to mine, by strip mining methods, such of the Upper Seaboard Seam of coal underlying the above designated parcel of land which cannot properly be mined, by deep mining, by [M. & W. Coal Company], so long as such strip mining operations by [Norma], its agents or independent contractors, shall not interfere with the deep mining operations by [M. & W. Coal Company] hereunder.

(G) In case any controversy shall arise between [M. & W. Coal Company] and [Norma] as to the observance, fulfillment and obligations of this Contract, such controversy shall be determined by arbitration * * *

When the M. & W. Coal Company executed the contract with Norma, the partnership owned equipment with a total value of $2,000 or $3,000, consisting of some mine cars, steel rail, a generator, and a pony. The partnership then purchased equipment on credit at a cost of approximately $21,000 from G. W. McCall, Sr., in order to conduct the mining operation. An entry of about 500 or 600 feet had already been made in the mine. Before commencing mining operations the partnership pumped water out of the mine, removed debris, and constructed a fan house, substations, and a chute. The partnership began removing coal from the mine about the latter part of May or the first part of June 1950.

During 1956 the partnership delivered all of the coal mined by it to Norma's processing plant where the coal was washed and separated into the various grades for the market. During 1956 Norma paid the partnership (Rebecca Coal Company) $4 per ton from January 1 to April 1, $4.15 from April 1 to October 6, and $4.30 from October 7 to December 31. Over the period 1950 through 1956 Norma paid the same price per ton of coal to all of its contractors.

During 1956 Norma sold its various grades of coal through an exclusive sales agent in Cleveland, Ohio. The monthly weighted averages in 1956 of the price of all coal sold by Norma through the sales agent were as follows:

| | | | |
|---|---|---|---|
| January | $5.75 | July | $5.37 |
| February | 5.66 | August | 5.47 |
| March | 5.27 | September | 5.59 |
| April | 5.38 | October | 5.95 |
| May | 5.49 | November | 5.87 |
| June | 5.48 | December | 5.82 |

As of December 31, 1956, the assets of Rebecca Coal Company were as follows:

| | | |
|---|---|---|
| Cash | | $23,789.64 |
| Notes and accounts receivable | | 4,245.96 |
| Fixed depreciable assets | $50,546.04 | |
| Less: Accumulated depreciation | 16,993.41 | |
| | | 33,552.63 |
| Insurance deposit | | 425.00 |
| | | 62,013.23 |

The fixed depreciable assets consisted largely of mining equipment.

During the year 1956, Rebecca Coal Company received gross income in the amount of $290,022.23 under its contract with Norma, and its net income was $66,708.69. In its partnership return of income for 1956 Rebecca Coal Company claimed percentage depletion in the amount of $29,002.22, of which $9,667.41 was allocable to the interest of petitioner Sam G. McCall and $9,667.40 to the interest of petitioner Walter Bernard McCall.

In the statutory notices of deficiency the respondent determined that the partnership was not entitled to depletion deduction in the amount of $29,002.22. The corresponding increase in the distributive shares of partnership income for each of the petitioners gave rise to the deficiencies determined by the respondent.

OPINION.

In *Walter Bernard McCall*, 27 T.C. 133, where the petitioners were the same parties who filed the petition in this case, the sole issue was whether Rebecca Coal Company possessed an economic interest in the coal which it mined for Norma under the May 1, 1950, contract. The year involved was 1952. This Court held that under the terms of the contract the partnership acquired an economic interest in the coal in place and was entitled to recover its investment by way of a percentage depletion deduction.

Petitioners' first contention is that there is a complete identity of facts, issues, and parties between the prior case of *Walter Bernard McCall*, *supra*, and the case before us with no intervening change in legal principles, and that under the doctrine of collateral estoppel this Court is foreclosed from again considering this same issue for a later year.

Collateral estoppel, or as it is sometimes called estoppel by judg-

ment, is applicable when the second suit is identical as to parties and issues with the first proceeding and the controlling facts and applicable legal rules remain unchanged. *Stern & Stern Textiles, Inc.*, 26 T.C. 1000. In *Commissioner* v. *Sunnen*, 333 U.S. 591, the Supreme Court warned that in the Federal income tax field "collateral estoppel must be used with its limitations carefully in mind." The opinion points out collateral estoppel operates to relieve the Government and the taxpayer from relitigating recurring claims of liability or nonliability after a judicial determination for 1 tax year when there is no substantial variation in the controlling facts or change in the applicable legal rules. However, as the Supreme Court in the *Sunnen* case points out, a change or development of the controlling legal principles may make the first determination "obsolete or erroneous, at least for future purposes." When there is such a change or development in the applicable legal principles then collateral estoppel is not applicable for the first determination should not be perpetuated. As the Supreme Court pointed out in the *Sunnen* case, to do so would result in "inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion." The intervening change in the law, or change in applicable legal rules, need not amount to anything more than a judicial declaration that effects a change in "the legal atmosphere." It can be a legal development resulting from intervening Supreme Court opinions pertinent to the problem that makes manifest the error of the first determination. *Commissioner* v. *Sunnen, supra.*

It is respondent's argument that after our opinion in *McCall*, in 1956, *Parsons* v. *Smith*, 359 U.S. 215, decided in 1959, effected a change or development in the legal rules on the same issue. *Parsons* v. *Smith, supra,* was the Supreme Court's first case involving an issue as to whether a miner taxpayer gained a capital or economic interest in the coal in place by reason of his operating contract with the owner or lessee. But this Court and several of the circuit courts had decided many such cases.

A study of these cases does not furnish with any unanimity any clear-cut principles that should be applied in determining when an operator engaged in extracting coal under a contract with the owner or lessee would be entitled to depletion. In most of the cases the contracts were much like the contract here involved. No useful purpose would be served by a lengthy analysis of each opinion.

Prior to *Parsons* v. *Smith, supra,* the courts had applied the test enunciated in *Palmer* v. *Bender*, 287 U.S. 551, in deciding whether a taxpayer possessed an economic interest in the mineral in place which would entitle him to a depletion deduction. This test was whether the taxpayer had acquired any interest in the mineral in place through

investment, and secured, by any form of legal relationship, income derived from the extraction of the mineral, to which he had to look for a return of his capital.

Among the various criteria used by the courts in deciding whether a taxpayer miner had acquired by an investment such an interest in the mineral in place as would amount to an economic interest were (1) the right to mine *all* of the coal in a particular tract and (2) the extent of his investment in equipment and buildings necessary to carry on the mining operations. *Commissioner* v. *Mammoth Coal Co.*, 229 F. 2d 535 (C.A. 3, 1955); *Commissioner* v. *Hamill Coal Corp.*, 239 F. 2d 347 (C.A. 4, 1956). But in several of the cases in which these and other criteria were applied, a particular taxpayer miner was held to possess an economic interest in the mineral in place in spite of the fact that the contract under which the taxpayer worked the mine was cancelable by either party on short notice. *Comm'sioner* v. *Hamill Coal Corp., supra; Weirton Ice & Coal Supply Co.* v. *Commissioner*, 231 F. 2d 531 (C.A. 4, 1956); *Commissioner* v. *Gregory Run Coal Co.*, 212 F. 2d 52 (C.A. 4, 1954).

In *Parsons* v. *Smith, supra*, and the companion case of *Huss* v. *Smith*, 255 F. 2d 600, the District Court had decided the taxpayers were not entitled to an allowance for depletion on amounts received by them under contracts with the owners of coal-bearing lands for the strip mining of coal from those lands and the delivery of it to the landowners. The Court of Appeals for the Third Circuit had affirmed both judgments, 255 F. 2d 595, 599. The opinion in *Parsons* v. *Smith, supra*, states certiorari was granted "Because of an asserted conflict with the principles applicable under the decisions of this Court * * *."

In the course of the opinion in the *Parsons* case the Supreme Court focused upon the fact that "By their contracts, which were completely terminable without cause on short notice, petitioners simply agreed to provide the equipment and do the work required to strip mine coal from designated lands of the landowners and to deliver the coal to the latter at stated points, and in full consideration for performance of that undertaking the landowners were to pay to petitioners a fixed sum per ton. Surely those agreements do not show or suggest that petitioners actually made any capital investment in the coal in place, or that the landowners were to or actually did in any way surrender to petitioners any part of their capital interest in the coal in place."

The opinion in the *Parsons* case goes on to list seven facts which negatived the strippers' claims that their contractual rights amounted to a capital interest and thereby an acquisition of an economic interest in the coal in place. They are:

(1) that petitioners' investments were in their equipment, all of which was movable—not in the coal in place; (2) that their investments in equipment were

recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to petitioners any capital interest in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that petitioners could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that petitioners were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered, which was, as stated in Huss [255 F. 2d 600], agreed to be in "full compensation for the full performance of all work and for the furnishing of all [labor] and equipment required for the work"; and (7) that petitioners, thus, agreed to look only to the landowners for all sums to become due them under their contracts. * * *

It is evident that the Supreme Court's emphasis on the cancellation feature of such contracts created a change in the legal atmosphere. This is amply demonstrated by the decision of the Fourth Circuit in *United States* v. *Stallard*, 273 F. 2d 847 (C.A. 4, 1959), which came after *Parsons* v. *Smith, supra*. In the *Stallard* case the taxpayer was engaged in the strip mining of coal under a contract which was cancelable by either party upon 30 days' written notice. The taxpayer was obligated to acquire heavy equipment at a cost of $300,000, in addition to equipment already owned by him, in order to perform the contract work. The Fourth Circuit, in holding that the taxpayer did not possess an economic interest in the coal in place by virtue of the contract, stated that among the number of circumstances which have been considered important factors in deciding cases of this nature, "Perhaps the most important is whether the producer has the right under the contract to exhaust the deposit to completion or is subject in this respect to the will of the owner through a provision in the agreement empowering the owner to terminate the contract at will." After quoting a pertinent passage from *Parsons* v. *Smith, supra*, the Fourth Circuit said:

We find no material difference between the circumstances of the Parsons case and those of the case at bar. In both, the claim to a deduction rested upon the contract between the taxpayer and the owner under which the taxpayer agreed to furnish the equipment and mine and deliver the coal to the owner at a fixed price per ton; and the right of the taxpayers to carry on the operation was completely subject to the will of the owner by reason of the right of the owner to cancel the contract at any time without cause on short notice. In view of the similarity of these essentials, the minor differences in the facts of the two cases do not distinguish them in the application of the statute.

We think it clear that *Parsons* v. *Smith, supra*, changed the legal atmosphere with respect to the issue here. The essential circumstances of short terminability of the contract without notice and payment by the owner of a fixed sum per ton had not been considered as factors in many court decisions. In fact, in *McCall*, the fact that the contract was terminable on 30 days' notice was not

mentioned and the fixed price-per-ton factor was explained away by noting the price was subject "to adjustment by mutual agreement of the parties depending upon fluctuations in the coal market." We reached our conclusion in *McCall*, "on the authority of *Virginia B. Coal Co.*, 25 T.C. 899 (1956) ; *Helen C. Brown*, 22 T.C. 58 (1954) ; and *James Ruston*, 19 T.C. 284 (1952)." The three authorities indicated that the presence of such factors as the right to mine all of the coal in a given area, and payment by the landowner or lessee which was in some manner geared to the market or ultimate sale price, would be sufficient to establish an economic interest in the coal in place. The fact that the contracts in *Virginia B. Coal Co.* and *James Ruston* were cancelable without cause in 30 and 90 days, respectively, was not considered as a factor in the opinion in either case.

We hold *Parsons* v. *Smith*, *supra*, effected a change in the legal rules applicable to the issues since *McCall*. We therefore reach the question whether petitioners possessed an economic interest under their contract with Norma in the coal in place which would entitle them to a depletion deduction in 1956 within the meaning of sections 611 and 613 of the Internal Revenue Code of 1954. It will suffice to point out that the contract under which petitioners were deep mining coal could be terminated by either party, without cause, upon the giving of 30 days' written notice,[1] and that the price per ton of coal received by petitioners was relatively fixed and could not be changed except by *mutual* consent. We think that the facts of this case make it indistinguishable from *Parsons* v. *Smith*, *supra*, and we regard that case as controlling here. See also *Utah Alloy Ores, Inc.*, 33 T.C. 917.

Petitioners also contend that even if we should decide that collateral estoppel does not apply, we are bound to sustain petitioners on the principle of stare decisis. This argument is based on two prior cases, *Walter Bernard McCall*, *supra*, and *National Labor Relations Bd.* v. *Norma Mining Corp.*, 206 F. 2d 38, where the courts interpreted the contract here involved as giving the petitioners the right to mine all of the coal in place. If we understand the argument correctly, it is that this right, together with other factors, established that petitioners acquired an economic interest in the coal in place, and that this Court is bound to follow this legal determination. There is no merit in petitioners' contention. The rule of stare decisis is that a principle of law, settled by a series

---

[1] Petitioners argue that the parties to the contract never intended that the 30-day cancellation notice should be operative. It is sufficient to say that the contract, as written, is controlling as to the rights of the parties and their respective interests thereunder. Moreover, there was testimony by Norma's attorney, who helped draft the standard contract, that "it meant just exactly what it said—either party had the right to terminate it on 30-day written notice without cause."

684

of decisions, should be followed by courts in similar cases. But the rule is a principle of policy and not a mechanical formula of adherence to prior decisions which prove unsound. *Helvering* v. *Hallock*, 309 U.S. 106. Moreover, we feel that the principle of stare decisis is amply satisfied in this case by our adherence to the recent Supreme Court decision in *Parsons* v. *Smith, supra*, which we deem controlling here.

We hold that petitioners did not acquire an economic interest, as distinguished from an economic advantage, in the coal in place under their contract with Norma, and, consequently, are not entitled to a depletion deduction in the year 1956.

*Decisions will be entered for the respondent.*