LARK L. WASHBURN AND ARLEA W. WASHBURN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 92521, 1198–62, 1299–62.   Filed May 27, 1965.

*Stanley L. Drexler* and *Ellis J. Sobol*, for the petitioners.
*Richard J. Shipley*, for the respondent.

HOYT, *Judge:* Respondent determined deficiencies in and additions to the income tax of petitioners as follows:

| Docket No. | Calendar year | Deficiency | Additions to tax | | Total |
|---|---|---|---|---|---|
| | | | Sec. 6653(a) | Sec. 6654 | |
| 92521 | 1956 | $21,599.57 | $1,079.98 | | $22,679.55 |
| 92521 | 1957 | 22,766.15 | 1,143.31 | $16.69 | 23,926.15 |
| 92521 | 1958 | 35,489.12 | 1,774.46 | 66.81 | 37,330.39 |
| 1198–62 | 1959 | 15,824.79 | | | 15,824.79 |
| 1299–62 | 1960 | 29,590.42 | | | 29,590.42 |
| Total | | 125,270.05 | 3,997.75 | 83.50 | 129,351.30 |

These cases have been consolidated for trial, briefing, and opinion. After abandonment and concession of various issues by both parties the only questions remaining for decision are whether petitioners are entitled to a deduction in each of the years in question for percentage depletion on income from contract mining of uranium, and whether the additions to tax for negligence were properly imposed. The additions to tax under section 6654 have not been challenged.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly and incorporated herein by this reference.

Petitioners are individuals, husband and wife, residing at Grand Junction, Colo. They filed joint income tax returns on the cash basis

---

[1] All statutory references herein are to the Internal Revenue Code of 1954.

for the years 1956 through 1960 with the district director of internal revenue at Denver, Colo. Since Arlea W. Washburn is a petitioner herein solely by reason of her having filed joint returns with her husband, references hereinafter to petitioner in the singular shall be to Lark L. Washburn.

During the years 1956 through 1960 petitioner was engaged in the business (as a sole proprietor) of mining uranium ore in the Uravan Mineral Belt in Colorado, principally under contracts with Union Carbide Nuclear Co., hereinafter referred to as Union Carbide. During this period petitioner entered into at least 31 separate contracts with Union Carbide as well as numerous amendments and termination agreements. These contracts provided for the mining by petitioner of a large number of mineral properties owned or held under lease by Union Carbide.

The different contracts involved have some variations. They may, however, be classified generally as regular contracts, cleanup contracts, and special contracts. Under the "regular contract" relationship a miner would contract with Union Carbide to mine a previously unmined area which was thought, as a result of test drillings, surveys, etc., made by either Union Carbide or the miner, or both, to contain a deposit warranting exploitation. These contracts required development work to be done concurrently with the mining, and they provided a schedule for payments by Union Carbide to the miner for doing the authorized development work. Such development was directed (as to how and where it was to be done) by the engineering department of Union Carbide.

A cleanup contract involves the miner's extracting ore from a mine that either had been previously worked extensively and considered to be economically exhausted with no remaining ore reserves, or had been worked-out but for certain spotty, sporadic pods of ore remaining in irregular, noncontinuous areas about the perimeter of the mine or in the pillars left by the previous miner. Cleanup contracts were generally not considered to involve basic development costs, and nothing beyond the agreed price for the ore was paid by Union Carbide, even if the miner in fact had to incur some further development expense. However, the price for ore mined under a cleanup contract was, in most cases, approximately 100 percent higher than under a regular contract. This was to give an incentive to miners to take on a project in an area where previous mining has removed the bulk of the deposit—to mine the thinner ore, take out the pillars of earth left in the mine (a delicate and hazardous procedure), and in some cases to do more development work in search of ore around the periphery of the existing mine.

Special contracts were of various types, generally with any needed development costs being borne by the miner. Only two of the con-

tracts here involved were special contracts; one required some development work by petitioner, the other did not.

By agreement with Union Carbide, petitioner explored unmined areas controlled by the company. If he found ore worth mining, Union Carbide would generally sign him to a regular contract to mine that particular deposit. He also explored previously mined areas and if he found remaining ore in sufficient quantity and quality to warrant mining, Union Carbide would generally sign him to a cleanup contract for that area. As part of his process of exploring both mined and unmined areas petitioner would drill small test holes in order to analyze the earth samples drilled out. The results of these test drillings were often recorded on maps maintained by Union Carbide. Petitioner sometimes installed timber for mine reinforcement which remained in the mine after he left. Under the "regular" contracts (covering previously unmined areas) Union Carbide supplied its own timbers and paid petitioner extra for development work such as test-drilling and sinking incline shafts to reach ore deposits. Under the "cleanup" form of contract petitioner would bear all such costs himself.

During 1956 and 1957 petitioner had four regular and six cleanup-type contracts. During 1958, 1959, and 1960, aside from the two special contracts, petitioner operated only under the cleanup-type contract. All of the regular contracts employed a printed form document containing identical provisions except for the description of the area to be mined and the list of equipment to be rented by Union Carbide to the miner. The cleanup contracts were also substantially identical to each other, employing a form document with variations applicable to the particular mine involved.

Each of the contracts here involved contained the following or substantially identical pertinent provisions:

All ore developed and mined under this contract shall be and remain the property of Company * * *

Either party may terminate this Agreement by written notice given to the other at least thirty days prior to the termination date specified in said Notice * * *. Unless terminated as herein provided, this Agreement shall continue for the period beginning _____ and ending _____. [All of the contracts except one specify a given 6-month period in these blanks. The single exception specifies a 1-year period.]

This Agreement may not be assigned by the Contractor without the prior written consent of the Company; nor shall this Agreement be assignable or transferable by operation of law. Anything herein to the contrary notwithstanding, this Agreement shall ipso facto terminate in the event of the death of the Contractor prior to the expiration or termination date herein provided for * * *

All of the contracts in 1957 and subsequent years contained a provision substantially as follows:

It is understood and agreed that Contractor has no economic interest in the

property and that he will make no claim for depletion allowance under the U.S. Internal Revenue Laws or under any state tax laws.

The "Contractor" (the miner) was to deliver all ore mined to bins or mills maintained by the company. The company would then sell the ore to the U.S. Atomic Energy Commission at a fixed price published in the Federal Register and in a public document known as Circular 5. All of the cleanup contracts entered into by the company in 1956, 1957, and 1958 provided that the contractor was to be paid per pound of ore a specified percentage of the Circular 5 price in effect at the time of delivery to the company's ore bins after deducting therefrom any royalty payable by the company to third parties. Thus, if the Circular 5 price changed, the price paid the contractor by Union Carbide would change. The four 1956 and 1957 regular contracts and all of the 1959 and 1960 cleanup contracts provided for payment to the contractor of a specified dollars and cents rate per pound. In some instances (including all four of the regular contracts) the price per pound was on a sliding scale based on the grade or richness of the ore. Thus, under this arrangement the price to the miner was not directly tied to the Circular 5 price, and any change in the Circular 5 price would benefit or harm only Union Carbide and would not affect the miner.

None of the contracts involved contained any provision permitting or requiring the petitioner to mine to exhaustion the mineral properties involved. Many of the contracts provided that the company would supply certain specified equipment for which the contractor was to pay a specified rental fee.

A large number of other contractors conducted mining operations for Union Carbide in the Uravan Mineral Belt under contracts like those under which petitioner operated. Throughout the 1956–60 period Union Carbide not infrequently exercised its right to terminate these contracts without cause. During this period petitioner's terminable 6-month contracts were generally renewed by Union Carbide as often as requested by him, thereby enabling him to work each mine to economic exhaustion. However, petitioner gave up some contracts so that he did not remove all ore from various of the mines on which he worked.

Petitioner had been contracting with Union Carbide for several years; the company considered him a very good contractor and was satisfied with his work. The company during this period had a continuing desire to sell ore and had no need to curtail production. Petitioner felt sufficiently confident that he would not be "terminated," that he was willing to purchase contracts of other miners,[2] and to make purchases of major equipment for use on Union Carbide mines. How-

---

[2] At least one such purchase was actually made in 1962, a year subsequent to the period here in question.

ever, petitioner was careful to inquire of Union Carbide as to the likelihood that his contractual relationship with the company would continue. Although Union Carbide apparently found no occasion to terminate without cause any contract of petitioner during the years in question, they at no time relinquished their contractual right to do so. On some occasions during this period they would modify an existing contract with petitioner by lowering the price to be paid for the ore or raising the minimum quality of the ore for which the previously established price would be paid. In 1963 (a year not here involved), under a contract like those herein described, petitioner was in fact given a 30-day termination notice.

After a contract was entered into, petitioner and his employees would drill and blast the mineralized areas and would then shovel the loosened rock into horse-drawn carts. The ore would then be removed by the carts to a common stockpile or bin. This kind of operation could be carried on with very little heavy equipment. Some of the needed equipment was provided by Union Carbide on a rental basis. Such of his own equipment as petitioner employed during the period here in question was movable, and was in fact moved from mine to mine.

Petitioner did not acquire title either to the ore in place or to the ore after it was mined.

Petitioner's 1960 income tax return indicates that at the end of 1960 petitioner owned the following depreciable business assets and equipment, all of which were acquired between January 1, 1956, and December 1960:

| Kind of property | Cost or other basis | Kind of property | Cost or other basis |
|---|---|---|---|
| Shuttle cars | $13,600.00 | Motor vehicle trucks | $51,691.21 |
| Compressors | 27,643.80 | Office equipment | 177.85 |
| Jackhammers | 4,491.50 | Mules and horses | 715.00 |
| Muckers | 5,138.55 | Jeeps and station wagons | 5,618.00 |
| Mine cars and ore cars | 2,800.40 | Wagon drill | 8,000.00 |
| Hoists | 5,500.00 | Trailers | 723.00 |
| Tugger | 612.00 | Dodge compressor truck | 7,290.00 |
| Transformers | 1,875.16 | Airplane | 17,160.00 |
| Loaders | 9,675.85 | Water truck | 450.00 |

Petitioner took annual depreciation deductions on all of his equipment. When he finished mining a particular site he would take away with him all of his supplies, tools, and equipment. The only assets which petitioner supplied to mine sites and left behind were some timbers installed by him for reinforcement in the course of his operations and certain improvements to a house in which petitioner's family lived during the years before us.[3] An access road which petitioner

---

[3] Of course, he also left the test-drill holes and the tunnels which he had dug as he went about his exploration and extraction. Despite petitioner's contention, we agreed with Union Carbide's view that these diggings could not be termed "improvements" to the property especially since the very extractive activity which produced them made it more unlikely that the mine would ever be worked again.

built to one mine site in 1960 at a cost of from $7,000 to $10,000 did not lead to a mine from which ore was produced in the years here involved. The cost of development work incurred by petitioner which was not reimbursed by Union Carbide, if any,[4] was deducted currently as business operating expense in petitioner's returns.

In the spring of 1960, petitioner, through his accountant, requested Union Carbide to revise its contracts with him to provide that he would be allocated 10 percent of the depletion allowance. Union Carbide refused his request.

In addition to his sole proprietorship activity in 1956, petitioner was engaged in a partnership with another miner named Shumway. The income and expenses of the partnership were not reported on a partnership return but both of the individuals separately reported his share of partnership income and expenses. This partnership was engaged in contract mining for Union Carbide, which dealt with the partners individually rather than as a partnership.

For each of the years 1956, 1957, and 1958 petitioner maintained an incomplete single-entry set of records. These records failed to record all receipts and all expenses. Petitioner reported as taxable net income in his returns for these respective years, $2,954.51, $5,418.33, and $16,322.31. The examining revenue agent had to make a complete bank deposit and check analysis in order to audit these returns. This examination resulted in respondent's determination of adjustments in substantial amounts. In addition to the depletion adjustment involved in the instant case, respondent disallowed certain expense deductions, to which petitioner has acceded, in the amounts of $26,275.29, $12,448.82, and $47,690.73 for 1956, 1957, and 1958, respectively.

#### ULTIMATE FINDINGS OF FACT

Petitioner did not have an economic interest in the ore in place on the properties he mined under contracts with Union Carbide during 1956 to 1960, inclusive.

At least part of the underpayment of income tax by petitioners for each of the years 1956, 1957, and 1958 was due to negligence.

#### OPINION

Petitioner seeks a deduction for depletion of the uranium deposits worked by him under the Union Carbide contracts, alleging the applicability of section 611(a).[5] While the Code section itself does

---

[4] Petitioner estimated, but kept no cost accounting records and has not proved, that his actual development costs were approximately 120 percent of the amount paid him by Union Carbide for development.

[5] SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION.

(a) GENERAL RULE.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regula-

not specify *who* is entitled to the deduction, the regulations make it eminently clear that depletion may be taken only by one who owns an economic interest in the mineral deposit in place:

Sec. 1.611–1 [Income Tax Regs.] Allowance of deduction for depletion.

(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possess [sic] a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. Further, depletion deductions with respect to an economic interest of a corporation are allowed to the corporation and not to its shareholders.

The question which we must decide is whether a contract miner under the fact situation here presented has an economic interest in the mineral deposits in place. This very issue has twice been decided adversely to the miners' position by the Supreme Court of the United States. *Paragon Coal Co.* v. *Commissioner*, 380 U.S. 624 (1965); *Parsons* v. *Smith*, 359 U.S. 215 (1959). These cases clearly control our disposition of the instant case.

*Parsons* v. *Smith, supra*, had been decided by the Supreme Court prior to the trial and submission of briefs in the instant case. In that case the Court enumerated certain factual circumstances which led to its conclusion that the miner had no economic interest in the ore in place. Petitioner in the instant case has attempted to minimize the effect of *Parsons* v. *Smith, supra*, by showing that the facts in his situation differ from those enumerated by the Supreme Court in *Parsons*. However, we find the distinctions which petitioner attempts to draw shallow and superficial and not of sufficient legal significance to warrant a result at variance with *Parsons*.

The Supreme Court decision in *Paragon Coal Co.* v. *Commissioner, supra*, was handed down on April 28, 1965, subsequent to the trial and submission of briefs in the instant case. The facts in *Paragon* are so substantially identical to those in the instant case as to preclude any possibility of our deciding in favor of petitioner on

tions prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate.

the question of economic interest even if we believed that the instant case could be distinguished from *Parsons* v. *Smith, supra*, which as previously stated, we do not.

Petitioner has made one novel argument which does deserve brief comment. In most of the prior cases holding that the miner possessed no economic interest, a significant factor has been the fact that the contract under which the miner operated was terminable at the will of the lessee. See *Parsons* v. *Smith, supra; Paragon Coal Co.* v. *Commissioner, supra.* Compare *Robert Lee Merritt*, 39 T.C. 257 (1962), with *Merritt* v. *Commissioner*, 330 F. 2d 161 (C.A. 4, 1964). In the instant case all of the contracts under which petitioner operated contained a specific provision permitting either party to terminate the arrangement without cause on short notice. Petitioner argues that under applicable State law this written provision would be unenforceable by Union Carbide after petitioner had expended a substantial sum on improving and preparing the mine for extraction activity in reliance on the contract. He relies on several Colorado cases in which a parole license was held to be irrevocable on principles of equitable estoppel after the licensee had made a considerable expenditure in reliance on his rights given by the license.

The Colorado Supreme Court has recognized that a license may become irrevocable when it is acted upon and fully executed by the construction of improvements upon the servient land. See, e.g., *Northern Colorado Irrigation Co.* v. *Reuter*, 67 Colo. 483, 186 Pac. 286 (1919) ; *Gyra* v. *Windler*, 40 Colo. 366, 91 Pac. 36 (1907). However, the facts disclosed by the opinions in those cases make them clearly distinguishable from the facts of this case, and we have been referred to no case so holding in which there was an express agreement between licensor and licensee with respect to termination. In other jurisdictions it has been held that the doctrine of irrevocability of licenses has no application to situations in which the parties have expressed their intention that the licensee's interest be terminable. See Conard, "Unwritten Agreements for the Use of Land," 14 Rocky Mt. L. Rev. 294, 300, and cases cited therein. Clearly, it would be difficult for a court to hold Union Carbide estopped to terminate a miner's contract when the miner has agreed to a specific written contract provision permitting termination. Any expenditures made to prepare the mine for extraction are made with an assumption of the risk of possible termination. Union Carbide did frequently exercise its right to terminate miners' licenses, apparently without challenge. Petitioner was obviously careful to assess the likelihood of termination before making large capital expenditures, and actually the evidence before us, taken as a whole, discloses that the bulk of such expenditures was for movable machinery and equipment and not for any sort of permanent improvements at the mine sites.

Finally, petitioner's position has already been rejected in at least one Colorado case with similar facts. *Portenier* v. *Walsen*, 112 Colo. 130, 146 P. 2d 894 (1944), held that a mining license was terminable by its express provisions even after substantial expenditures were made by the licensee. The court said:

By the very terms of the license agreement, defendant ran the risk of being dispossessed at any time after the first ninety days of his occupancy. The fact that the mine, by virtue of his work, has become more valuable commercially was the express incentive for the executor to allow defendant to work the property, as stated in the agreement. During that time defendant was afforded the opportunity to make what profit he could from the ores he extracted.

We cannot conclude that the contract clauses here involved, permitting termination at will, were unenforceable by Union Carbide, or that under Colorado law Union Carbide would have been estopped or prevented from exercising its specifically reserved right to terminate.

We hold that petitioner is not entitled to a depletion deduction in any of the years in question. *Paragon Coal Co.* v. *Commissioner*, *supra; Parsons* v. *Smith, supra; William M. Legg*, 39 T.C. 30 (1962); *J. Shelton Bolling*, 37 T.C. 754 (1962); *Walter Bernard McCall*, 37 T.C. 674 (1962), affd. 312 F. 2d 699 (C.A. 4, 1963); *Utah Alloy Ores, Inc.*, 33 T.C. 917 (1960); *United States* v. *Stallard*, 273 F. 2d 847 (C.A. 4, 1959), reversing 170 F. Supp. 267 (W.D. Va. 1958).

For each of the years 1956, 1957, and 1958 petitioner kept an incomplete single-entry set of books. These books did not include all items of income or expense of the mining business. Upon examination the revenue agent had to resort to analysis of the bank accounts. Failure to maintain adequate books which clearly reflect income is in itself grounds for the imposition of the negligence penalty. *H. A. Hurley*, 22 T.C. 1256 (1954), affd. 233 F. 2d 177 (C.A. 6, 1956).

Petitioner bears the burden of proving error in respondent's addition to tax for negligence. *David Courtney*, 28 T.C. 658 (1957), and cases cited therein at page 669. At trial petitioner was asked by his counsel about an audit made by respondent's agent of certain returns of petitioner for years prior to the years here in question. When asked whether the agents in the prior audit had expressed disapproval of petitioner's records or manner of maintaining them, respondent's counsel objected to the question and the objection was sustained. Petitioner contends that if permitted to answer he would have testified that in the prior audit no objection was made to his accounting records or methods. Relying on *Estate of Albert D. Phillips*, a Memorandum Opinion of this Court,[6] petitioner then asserts that he cannot be deemed to have been negligent in engaging in the same manner of recordkeeping during the years here involved as was tacitly approved by respondent's agents in their prior years' audit.

---

[6] T.C. Memo. 1955–139, reversed on another issue 246 F. 2d 209 (C.A. 5, 1957).

Petitioner quotes the following passage from the above-mentioned Memorandum Opinion:

While of course respondent is not estopped to claim here that the records were inadequate, it is quite different to say that decedent was negligent in pursuing the same course that respondent had already tacitly approved. We regard the evidence produced by petitioner on this issue as prima facie sufficient to rebut the correctness of respondent's determination and place the burden of going forward upon him. * * *

We hold that even had petitioner been permitted to testify concerning respondent's alleged "tacit approval" the additions to tax for negligence would be approved.

As we view it, a showing of prior tacit approval merely rebuts the presumption of correctness which attaches to respondent's original assertion of the negligence penalty and shifts the burden of going forward with evidence to the respondent. In the instant case, respondent has carried that burden. He has shown that for each of the years 1956, 1957, and 1958 the examining revenue agent was compelled to examine bank records to audit petitioner's returns and that he made numerous and substantial adjustments to petitioner's business expenses, gross income, and depreciation. These adjustments have not been contested by petitioners. For example, in their 1957 and 1958 returns, petitioners claimed numerous expenditures of an obviously capital nature, such as shuttle cars and mules, as business expenses under categories such as "Powder" and "Supplies." Where such resort to records other than books of account is required to determine taxable income and substantial adjustments to income have been made, the taxpayers' failure to contest or explain the items or to offer any excuse about them warrants imposition of the negligence penalty. *Rhett W. Woody*, 19 T.C. 350 (1952). The additions to tax under section 6653(a) are sustained.

*Decisions will be entered under Rule 50.*