WINNSBORO GRANITE CORPORATION, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 67661, 67662, 69640. Filed July 29, 1959.

---

[1] The following proceedings are consolidated herewith: Winnsboro Granite Corporation and Affiliate, Rion Crush Stone Corporation, Docket No. 67662; Rion Crush Stone Corporation, Docket No. 69640.

*Robert W. Hemphill, Esq.*, for the petitioners.
*James E. Johnson, Jr., Esq.*, for the respondent.

FISHER, *Judge:* In these consolidated proceedings, respondent determined deficiencies in income tax for the above petitioners for the taxable years and in the amounts as follows:

| Docket No. | Petitioner | 1951 | 1952 | 1953 |
|---|---|---|---|---|
| 67661 | Winnsboro Granite Corporation | $4,350.90 | $3,500.98 | |
| 67662 | Winnsboro Granite Corporation and Affiliate, Rion Crush Stone Corporation. | | | $1,010.73 |
| 69640 | Rion Crush Stone Corporation | | 3,116.48 | |

The issues presented for decision are (1) whether transportation costs incurred in shipping granite and crushed stone to the railhead or jobsite are properly includible in the "gross income from the property" as defined in section 114(b)(4)(B) of the Code of 1939 [2]; (2) whether the basis of a rock quarry is to be properly reduced by the amount of the percentage depletion deductions allowable in prior years.

### FINDINGS OF FACT.

Some of the facts have been stipulated, and, to the extent so stipulated, are incorporated herein by this reference.

Winnsboro Granite Corporation (hereinafter called Winnsboro) was incorporated under the laws of South Carolina on February 17, 1925, for the purpose of operating a granite quarry.

Rion Crush Stone Corporation (hereinafter called Rion) was incorporated under the laws of South Carolina on March 28, 1939, with authorized capital stock of $100,000, consisting of 1,000 shares of $100 par value stock. Since 1942, the total capital stock in this amount has been owned by the Winnsboro Granite Corporation.

Federal corporation income tax returns, Form 1120, were filed by Winnsboro for the calendar years 1951 and 1952 and by Rion for the calendar year 1952, with the district director of internal revenue at Columbia, South Carolina.

Winnsboro and Rion filed a consolidated tax return for the calendar year 1953 with the district director of internal revenue for the district of South Carolina. Winnsboro and Rion each maintained its records and prepared its income tax returns on an accrual method of accounting.

Winnsboro is a wholesaler of monumental stone. Rough granite blocks are extracted from its quarry, known as Anderson Quarry, and are shipped to customers by rail. The stone is loaded on cars at Anderson Quarry and secured on the cars by Winnsboro. Winnsboro pays the Rockton & Rion Railway, a small intrastate carrier, to carry

---

[2] All statutory references are to the Code of 1939 unless otherwise specifically indicated.

the stone to the interstate outlet point, Rockton, on the Southern Railway in Fairfield County, South Carolina, and all interstate shipments are made f.o.b. Rockton. The Rockton & Rion Railway operates between Rockton and Rion, a distance of 4 miles. A spur track extends from Rion to Anderson Quarry, a distance of 11 miles.

As only rough blocks are produced by Winnsboro, no processing of the stone by Winnsboro takes place after it is loaded for shipment at Anderson Quarry. Any processing necessary to convert the rough stone into monuments is applied by the purchaser or consignee of the stone after it has been received from Winnsboro.

Anderson Quarry is located approximately 15 miles west-southwest of Rockton, South Carolina, which is located on the Southern Railway, a recognized interstate carrier. The quarry lies in a valley and has two paved roads leading to it. Approximately 10 to 15 per cent of the stone sold by Winnsboro is transported from the quarry by trucks.

When sales of stone are made at the quarry, the stone is loaded on the trucks by employees of Winnsboro. The stone so transported by truck is considered to be small pieces, ranging from 1 to 3 tons in weight.

In interstate shipments by Winnsboro, the granite blocks are hauled from Anderson Quarry to Rockton via Rockton & Rion Railway, for delivery to the Southern Railway. The empty flatcars are placed on the siding of the Rockton & Rion Railway by locomotives of the Southern Railway. The Rockton & Rion Railway is paid by Winnsboro, on interstate shipments, on the load each car carries from Anderson Quarry to Rockton. The flatcars used by Rockton & Rion Railway in transporting granite from Anderson Quarry are the property of the Southern Railway.

Winnsboro bills its customers on interstate shipments f.o.b. Rockton which is on the Southern Railway and is designated as the point of origin on the bill of lading. Winnsboro includes the freight in the sales price of the stone. Winnsboro is billed separately by the Rockton & Rion Railway for freight charges on stone transported from Anderson Quarry to the f.o.b. point of shipment.

In each of the years 1951, 1952, and 1953, Winnsboro computed its depletion allowance under the percentage method authorized by section 114(b)(4) of the Code of 1939, by applying a rate of 5 per cent to the gross sales of stone reported on its return. In determining the gross sales of stone, Winnsboro included the freight charges paid to the Rockton & Rion Railway for transporting granite from Anderson Quarry to the f.o.b. point of shipment.

Sales of stone reported, deduction for depletion, and the amount of freight paid to Rockton & Rion Railway for transporting granite

from Anderson Quarry to the f.o.b. point of shipment by Winnsboro for the years 1951, 1952, and 1953 are as follows:

| Year | Sales of stone reported | Depletion deducted | Freight (included in sales of stone) |
|---|---|---|---|
| 1951 | $290,279.15 | $14,513.96 | $12,952.51 |
| 1952 | 311,547.19 | 15,577.40 | 12,561.56 |
| 1953 | 285,210.81 | 14,260.54 | 12,595.50 |

Rion, a wholly owned subsidiary of Winnsboro, owns and operates a stone quarry at Rion, South Carolina. Its business consists of removing rough stone from the quarry, crushing the stone into aggregates, and selling the product for use principally in highway construction and paving. Bids on crushed stone for use by paving and building contractors, the South Carolina Highway Department, and other political subdivisions, generally require that prices include transportation to the location of use or jobsite. Rion sold the greater portion of its products at prices which included cost of delivery to the customer's jobsite. Generally, bids are submitted by Rion on an f.o.b. destination basis. In those cases where Rion sold crushed stone f.o.b. plant, the freight was billed separately to the customer.

For the year 1952, Rion computed its depletion allowance under the percentage method authorized by section 114(b)(4) of the Code of 1939 by applying a rate of 5 per cent to sales of crushed stone in the amount of $452,679.72, which represented gross sales of $458,568.88 less freight billed to customers in the amount of $5,889.16 on crushed stone which was sold f.o.b. Rion's plant. The sales of crushed stone used in determining the depletion deduction included $60,608.98 for "Freight Out" which represented the cost of shipping crushed stone to customers on sales made f.o.b. jobsite.

On the consolidated Federal corporation income tax return filed by Winnsboro and Rion for the year 1953, a net taxable loss was reported on the activities of Rion in the amount of $58,628.71. In computing the net loss on Rion's activities, a deduction was claimed for percentage depletion in the amount of $18,055. The depletion was determined by applying a rate of 5 per cent to sales of crushed stone in the amount of $361,100.11, which represented gross sales of $363,848.50 less freight billed to customers in the amount of $2,748.39 on crushed stone which was sold f.o.b. Rion's plant. The sales of crushed stone used in determining the depletion deduction included $79,304.42 for "Freight Out" which represented the cost of shipping crushed stone to customers on sales made f.o.b. jobsite.

Sales of crushed stone used in computing depletion, the freight charges included in those sales, and the depletion claimed by Rion for the years 1952 and 1953 are as follows:

| Year | Sales of crushed stone | Freight (included in sales price on sales f.o.b. job-site) | Depletion deducted |
|------|------|------|------|
| 1952 | $452,679.72 | $60,608.98 | $22,633.99 |
| 1953 | 361,100.11 | 79,304.42 | 18,055.00 |

Following is a summary of the depletion allowed Rion through December 31, 1951:

Basis of quarry land—acquired 1939 _____ $65,000.00

Depletion allowed at 5 cents per ton through Dec. 31, 1943 _____  20,656.87
Depletion allowed at 2½ cents per ton—

  1944 _____ $1,159.82
  1945 _____ 1,225.00
  1946 _____ 6,194.71
  1947 _____ 6,176.33
  1948 _____ 5,562.32
  1949 _____ 4,218.11
  1950 _____ 4,934.23

                  29,470.52
Percentage depletion—1951 _____ 16,104.21

Depletion allowed through year 1951 _____ 66,231.60

Winnsboro's first commercially marketable product is the rough granite blocks after they have been extracted and loaded for shipment at Anderson Quarry.

The freight charges in the amounts of $12,952.51, $12,561.56, and $12,599.50 paid by Winnsboro for transporting stone to the Southern Railway in Rockton on interstate shipments are costs beyond mining and their repayments are not includible in "gross income from the property" for the purposes of computing the depletion allowance of Winnsboro for the years 1951, 1952, and 1953, respectively.

Rion's first commercially marketable product is crushed stone at its plant.

The freight charges in the amounts of $60,608.98 and $79,304.42 paid by Rion for transporting crushed stone to its f.o.b. point are costs beyond mining and their repayments are not includible in "gross income from the property" for the purposes of computing depletion allowance of Rion for the years 1952 and 1953.

Rion had recovered the basis of its property in depletion allowances prior to 1953 and had no net income from its mining property for that year.

### OPINION.

For the sake of clarity, we shall discusss our views regarding the transportation charges of Winnsboro and Rion, as well as Rion's depletion allowance for 1953, as separate issues.

## Issue 1. Winnsboro.

Winnsboro wholesales rough monumental stone which it extracts from Anderson Quarry. The quarry is approximately 15 miles from Rockton, South Carolina, the nearest point to the Southern Railway, a recognized interstate carrier.

About 85 or 90 per cent of the stone mined by Winnsboro is shipped by rail. The remaining 10 to 15 per cent of sales are made at the quarry where the stone is shipped by truck.

When shipping by rail, Winnsboro utilizes the services of the Rockton & Rion Railway, a small intrastate carrier which operates between Rockton and Rion, with a spur track to Anderson Quarry. The flatcars used in transporting the stone are placed on a siding at Rockton by engines of the Southern Railway and are pulled to the Anderson Quarry by the Rockton & Rion Railway, and when they are loaded, are returned by that railway to the Southern Railway at Rockton. No process is performed on the stone from the time it is loaded at the quarry until it reaches the customer.

On interstate shipments, Winnsboro bills its customers f.o.b. Rockton, and for each of the years 1951, 1952, and 1953, has included in the "gross income from the property," the transportation charges paid to the Rockton & Rion Railway in computing its percentage depletion allowance.

Respondent contends that the transportation from the quarry to Rockton was not necessary for any further processing, but, rather, was merely a cost of transporting a product to a customer. He contends that such charges represent a cost beyond mining and their repayment should not be included in the "gross income from the property" for purposes of computing the depletion allowance.

Petitioner contends that its first commercially marketable mineral product is obtained when the stone arrives in Rockton and is transported over the Southern Railway. Petitioner premises its argument on the fact that the size of the blocks of stone make shipment by rail necessary. Petitioner further alleges that since the cost of transportation from the quarry to Rockton is included in the price of the stone to its customers, such costs are properly part of "gross income from the property."

Section 114(b)(4) of the Code of 1939 [3] provides that the gross

---

[3] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

  (b) BASIS FOR DEPLETION.—

    *       *       *       *       *       *

    (4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

      (A) In General.—The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

        (i) in the case of * * * stone * * * granite * * * 5 per centum,

    *       *       *       *       *       *

of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the tax-

income from the property for the purposes of computing percentage depletion means "gross income from mining." The term "mining" as used therein includes not only the extraction of the mineral, but also the ordinary treatment processes normally applied by the owner and operator in order to arrive at a commercially marketable mineral product.

The Code specifically includes by way of definition of the "ordinary treatment processes" in the case of minerals customarily sold in crude form such as granite, the sorting, concentrating, and sintering to bring it to shipping grade and form, and loading for shipment.

Congress, in 1950, amended section 114[4] to provide that the term "gross income from mining" was to include "so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto."

The specific issue in the case at bar is whether the transportation of the mineral from the quarry to Rockton qualifies as an ordinary treatment process.

Petitioner's emphasis, however, is somewhat different. Its argument is not couched in the above terms, but concerns itself with the question of when it obtains a commercially marketable mineral product. Petitioner concludes that such a product exists at the f.o.b. railhead rather than at the time the mineral is loaded for shipment at the quarry.

Petitioner's approach is premised on a misconception of the meaning of the statute. The transportation allowance included in the "gross income from mining" is not predicated on the first commercially marketable product, but, rather, is for the purpose of transporting the mineral for additional processing so as to become commercially marketable.

payer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining" as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. The term "ordinary treatment processes", as used herein, shall include the following: * * * in the case of * * * minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; * * *

[4] Revenue Act 1950, 64 Stat. 906.

It seems clear, from the language of the statute as well as its legislative history,[5] that in order for the transportation to be a part of the "gross income from mining," it must be from the point of extraction to a plant or mill where the ordinary treatment process is applied.

It has been stipulated, and we have found as a fact, that after the rough blocks of stone are loaded on the flatcars at the quarry, no additional processing takes place until the customer or consignee converts the stone into monuments.

The cases relied upon by petitioner do not, in our opinion, support its contentions that the transportation costs from the quarry to the railhead are f.o.b. point or part of the "gross income from mining." In *United States* v. *Cherokee Brick & Tile Co.*, 218 F. 2d 424 (C.A. 5, 1955), the issue to be decided was whether the taxpayer's gross income from mining be permitted to include transforming the clay it had extracted into brick or tile "by an extrusion or molding machine, by burning the units in kilns, and by loading the burnt brick and tile for shipment?" The court said (p. 425) :

The statutory language is clear and unambiguous, which is that gross income from mining must include the income from ordinary treatment processes which must be applied to the ore or mineral in order to obtain the commercially marketable mineral product, that is, the first product which is marketable in commerce. There is no provision in the statute for excluding any process before such a marketable product is reached. The only restriction is that the processes must be the ordinary treatment processes normally applied by mine owners or operators.

To cite and distinguish all the cases relied on by petitioner, other than the *Cherokee* case, *supra*, would serve no useful purpose. Suffice it to say that we have been cited no case, nor has our research elicited one, where gross income from mining included transportation after the completion of the ordinary treatment processes, and we do not believe that Congress intended such result.

---

[5] The Senate Finance Committee (S. Rept. No. 2375, 81st Cong., 2d Sess., pp. 53–54) states :

"Under the House bill the 'gross income from the property' upon which percentage depletion is applied does not include any amount which reflects transportation beyond 'the property.' While this rule may be equitable when the first processing occurs on the property, it discriminates against the case where the first processing must be done elsewhere. Accordingly your committee has amended this provision so as to make it conform with what your committee believes is the intent of existing law. The code section here involved was added in the 1943 Revenue Act so that the law would clearly have the same meaning as that intended by the depletion provisions in the 1932 act and contemporary Treasury regulations interpretative thereof. Those regulations specified that the gross income computation for depletion purposes was to be 'before transportation from the place where the last of the processes listed below was applied.' Terrain, water supply, or other factors, sometimes permit the application of ordinary treatment processes directly on the mining property. At other times the plants to apply such processes to obtain the commercially marketable mineral products are normally located some distance from the mouth of the opening of the mine, but are at the nearest practicable point at which such processes can be efficiently performed. The transportation to these plants and the ordinary treatment processes applied are included as a part of mining in determining gross income for percentage depletion purposes."

See also Senate Hearings on H. Rept. No. 8920, 81st Cong., 2d Sess., pp. 447, 767.

We hold, therefore, that the transportation charges paid by Winnsboro to the Rockton & Rion Railway in the amounts set forth in our findings are a cost beyond mining and their repayment is not includible in the "gross income from the property" for the purpose of computing the percentage depletion of Winnsboro for the years 1951, 1952, and 1953, respectively.

### Issue 2. Rion.

Rion Crush Stone Corporation, a wholly owned subsidiary of Winnsboro, owns and operates a stone quarry at Rion, South Carolina. Its business consists of removing rough stone from the quarry, crushing the stone into aggregates, and selling the product for use principally in highway construction and paving.

While some sales are made directly from the quarry, the greater portion of the stone is sold under bids which are submitted by Rion to customers on an f.o.b. jobsite basis. These bids to contractors, the South Carolina Highway Department, and other political subdivisions, generally require that the price include transportation to the location of use or jobsite.

During the years 1952 and 1953,[6] Rion included in "gross income from the property," in computing depletion allowance, transportation costs incurred in transporting the crushed stone to its f.o.b. destination, in the amounts of $60,608.98 and $79,304.42, respectively.

The contentions of the parties on this issue are essentially the same as those discussed *supra* relating to Winnsboro. The only significant distinction, factually, between Winnsboro and Rion is that many of Rion's customers were political subdivisions whose practices generally require that prices to them include transportation to the location of use or jobsite. In our view, it is a distinction without a difference.

The fact that these customers generally require prices to include transportation f.o.b. jobsite does not convert the transportation to the customers into transportation for ordinary treatment processes, all of which occurred prior to shipment.

We need not labor this point further. We believe our views are adequately expressed in the discussion of Winnsboro, *supra*, and govern the issue here. We, therefore, hold for respondent on this issue.

### Issue 3. Basis and Depletion.

Rion's quarry land was acquired in 1939 and had an unadjusted basis of $65,000. Rion has been allowed $66,231.60 for depletion allowances for this land through 1951. Of this amount, $16,104.21 was a percentage depletion allowance in 1951. Prior to 1951, Rion claimed only cost depletion allowances.

---

[6] The issue of whether Rion is to be allowed any depletion allowance for 1953 will be discussed *infra*.

During the year 1953, Rion claimed a percentage depletion allowance in the amount of $18,055. Rion filed a consolidated tax return with Winnsboro for the year 1953 in which a loss was reported on the activities of Rion in the amount of $58,628.71.

Respondent contends that, under the facts as stipulated, Rion is not permitted a deduction for depletion, either cost or percentage, in 1953.

Respondent argues that Rion, having a net taxable loss of $58,628.71, is not permitted to use percentage depletion, as the statute, section 114(b) (4) (A), limits the percentage depletion allowance to 50 per cent of the net income of the taxpayer computed without allowance for depletion.

Respondent further contends that Rion cannot avail itself of the cost depletion allowance since its basis had been entirely recouped through prior depletion allowances.

Thus stated, the facts present the issue of whether the basis of the mining property should be reduced (adjusted) by the amounts of the depletion allowance, both cost and percentage, allowable to the taxpayer.

We conclude that this issue must be answered in the affirmative.

Section 113(b) (1) (B) [7] provides that the basis of property shall be adjusted for depletion to the extent allowed as a deduction in the computation of net income.

The regulations under this section [8] state:

The deductions by which the cost or other basis is to be decreased shall include deductions allowed under section 114(b) (2), (3), and (4) of the Revenue Act of 1932, the Revenue Act of 1934, the Revenue Act of 1936, the Revenue Act of 1938, and the Internal Revenue Code, for the taxable year 1932 and subsequent taxable years, but the amount of the diminution in respect of depletion for taxable years before 1932 shall not exceed a depletion deduction computed without reference to discovery value in the case of mines, or without reference to discovery value or a percentage of income in the case of oil and gas wells.

[7] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(b). ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

*    *    *    *    *    *    *

(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount—

(i) allowed as deductions in computing net income under this chapter or prior income tax laws, and

(ii) resulting (by reason of the deductions so allowed) in a reduction for any taxable year of the taxpayer's taxes under this chapter (other than subchapter E), subchapter E of chapter 2, or prior income, war-profits, or excess-profits tax laws, but not less than the amount allowable under this chapter or prior income tax laws. *    *    *

[8] Regs. 118, sec. 39.113(b)(1)–1(c)(1)(ii).

We think these regulations reflect the essence of the language of the statute and the congressional intent regarding this problem. We expressed this view in *Frank Lyons*, 10 T.C. 634 (1948), in which we held that the basis of property is to be reduced by the amount of percentage depletion allowed. We there quoted from Senate Report No. 665 (Revenue Bill of 1932), 72d Cong., 1st Sess., p. 29, as follows:

The requirement in subparagraph (B) of the House bill that the adjustment for depletion should be computed without regard to discovery value or percentage depletion is eliminated in the bill as to all adjustments in respect of the taxable year 1932 and subsequent years. Your committee believes it only fair that *the basis of the property should be adjusted to the full extent of the depletion allowances, without regard to the method by which these allowances are determined.* In view of the substantial change from the existing law in this respect, your committee is of the opinion that it should not disturb the depletion adjustments in respect of years prior to 1932. [Emphasis supplied.]

Section 113(b) has been amended since 1932. An examination of the committee reports attending these amendments evidences no desire or intent on the part of Congress to change this principle.

The last amendment to this section was in 1952 when the statute was amended to provide that the basis of property shall be adjusted by the amount of depreciation previously allowable, or by depreciation previously allowed, if that was more than the amount allowable, but only to the extent that the deduction of the excess amount produced a tax benefit for any year.

The Senate Finance Committee, in S. Rept. No. 1160, 82d Cong., 2d Sess., stated: "Your committee continues the provisions of existing law, also included in the House bill, which require that the basis of property shall be reduced in any case by amounts allowable whether or not any benefit is derived therefrom."

Petitioner's arguments on this issue are without merit. Respondent does not claim that a taxpayer using the percentage depletion allowance is confined to recovery of its basis. *Louisiana Iron & Supply Co.*, 44 B.T.A. 1244 (1941). Percentage depletion is not based upon cost. It is, of course, limited to the percentage prescribed by the statute and is subject to the further limitation that such depletion shall not exceed 50 per cent of the net income from the property.

The question here is whether the basis of the depletable property shall be adjusted by the amount of the depletion deduction allowable to petitioner regardless of whether petitioner uses a cost or percentage depletion method. We answer that in the affirmative. The result is, as the Commissioner contends, that for 1953 no deduction is allowable for percentage depletion because of the net income limitation and no depletion is allowable on cost since its cost has been recovered through prior depletion deductions.

*Decisions will be entered under Rule 50.*