Raymond C. Desrosiers, et al. [1] v. Commissioner. Desrosiers v. Commissioner
Docket Nos. 82007-82011.
United States Tax Court
T.C. Memo 1962-47; 1962 Tax Ct. Memo LEXIS 260; 21 T.C.M. (CCH) 264; T.C.M. (RIA) 62047; March 7, 1962
*260 Petitioners were partners in a business which performed auger-mining operations to extract coal for Westmoreland Coal Company, a lessee of coal mines in West Virginia. Petitioners were independent contractors, receiving a fixed price per ton from Westmoreland which completely controlled the disposition of the coal mined. The contract with Westmoreland was cancelable by either party on 30 days' notice after the first 120 days. Held, petitioners had no economic interest in the coal in place and were therefore not entitled to the allowance for depletion under sections 611 and 613, I.R.C. of 1954. Robert H. C. Kay, Esq., Charleston National Bank Bldg., Charleston, W. Va., for the petitioners. Mark H. Berliant, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in tax and additions to tax for the calendar years 1956 and 1957: Deficiencies
Additions
Docket
Income
To Tax
No.
Year
Tax
Sec. 6654
82007
1956
$5,398.72
1957
4,648.43
82008
1956
897.38
$ 9.18
1957
2,012.07
82009
1956
3,551.06
42.27
1957
6,200.02
82010
1956
3,477.39
38.49
1957
6,051.34
82011
1956
416.65
1957
5,361.79
136.51 The principal issue remaining for our determination *261 is whether the partnership, of which the five male petitioners are members, owned an economic interest in the coal in place in designated parts of a certain coal seam so as to entitle it to the percentage depletion allowance provided by section 613. [2]
Dependent upon our resolution of the above issue, and to give effect to settlement by the parties of an issue regarding depreciation, we must determine whether the last four petitioners are liable for the additions to tax for substantial underestimates of tax liability for the years indicated. Findings of Fact The five male petitioners herein, since 1950 and during the years in issue, were the five partners in a partnership doing business under the name "Desrosiers Brothers Coal" with offices in Madison, West Virginia. They will be hereinafter referred to as petitions or by their first names. Sometime in October 1955, Raymond and Ernest visited several seams of coal at the Hampton mine in Boone County, West Virginia. The mine was leased by Westmoreland Coal Company (hereinafter called "Westmoreland") with home offices in Philadelphia, Pennsylvania. Raymond *262 and Ernest there discussed the possibilities of the partnership "auger mining" the coal in these seams. The mine had already been "strip" mined by other parties. [3] *263 The initial discussions were with C. J. Robinson who was general manager in charge of Westmoreland's operations and the administration of Westmoreland's policies in Boone County. William M. Hanlon, chief of Westmoreland's engineering department, also participated in these initial conferences at the mine. Robinson suggested that the parties go to his company's home office in Philadelphia where they could confer with the company's attorneys and with William A. Gallagher, the company vice president. The home office approved the general outlines and prices of the proposed agreement between the parties but Gallagher suggested another conference at the mine to work out the details. Westmoreland's attorney then prepared for petitioners a proposed draft of the contemplated agreement between the parties and at a conference held at the mine the various differences were ironed out. The principal difference centered around the so-called "move-in" clause. The draft agreement had provided that the contract was to be noncancelable by either party for a period of 60 days from the date of the agreement. Petitioners were dissatisfied with this provision and insisted upon, and obtained, a 120-day clause in its stead. The purpose of this latter clause, from petitioners' viewpoint, was to afford them an opportunity for exploration of the seam to determine whether auger mining was economically feasible before they purchased a new auger better suited to the coal seams in question than their existing equipment. The cost of this exploration and testing over and above the amounts received for the recovery during this period was $30,000. [4] *264 When Westmoreland's officials agreed to the insertion of this 120-day clause, and the smaller details in the draft agreement were ironed out, the Westmoreland representatives returned to Philadelphia and on November 4, 1955, the Westmoreland attorney sent a revised copy of the agreement to both parties. Finally, on November 15, 1955, the parties signed a formal contract at the Hampton mine. The agreement recited that it was made on November 1, 1955, and included the 120-day clause which petitioners had requested, the 120 days to run from November 1. After the 120-day period, either party could cancel at will, upon 30 days' written notice. The agreement further provided: 2. That the Contractor shall, within fifteen days from date hereof, commence to mine and remove from such areas in the Stockton Seam, as set forth on said map, such tonnage of coal as shall be agreed upon from time to time by the Coal Company and the Contractor. 3. That all coal auger mined by the Contractor *265 shall be delivered to the head house of the Coal Company at Hampton mine and shall be clean and reasonably free from slate, rock and other impurities; that for all coal so delivered the Coal Company shall pay to the Contractor a price of $2.50 per net ton of 2,000 pounds; [There follow provisions for reductions in price dependent upon percentages of impurities in the coal.] * * * that for any coal mined and delivered to the head house containing more than 14% slate, rock or other impurities, the Contractor shall not be entitled to any payment therefor. The percentage of impurities shall be determined by the Coal Company from time to time by standard sampling methods. The Contractor shall have the right to stock pile coal at a place to be determined by the Coal Company. Any coal to be placed on the stock pile shall be sampled by the Coal Company at the request of Contractor. Notwithstanding the sampling of coal placed on the stock pile, payment for the coal delivered to the tipple shall be based upon the result of sampling at the tipple. * * *
7. The Contractor shall, from time to time, submit to the Coal Company its plans of auger mining and obtain the approval of the Coal Company before *266 operating thereunder and the Coal Company shall, at all reasonable times, be permitted to survey, measure and inspect the auger mine workings of the Contractor. * * *
9. The Contractor shall take the premises as it finds it at its own risk, furnish its own explosives, tools and other equipment, employ, discharge, discipline and compensate the miners and other working forces performing work for it without reliance or call upon the Coal Company with respect to such miners or other employees, and to provide competent supervision, control and direction of such working forces so as to insure the use of proper auger mining methods. 10. The Contractor shall pay all taxes of every kind which may be assessed upon any buildings, structures or improvements, or other property placed by the Contractor upon the land leased by the Coal Company and used in connection with the performance of the provisions of this contract. * * *
12. The Contractor agrees not to assign this contract or sell or transfer the same without the written consent of the Coal Company. * * *
14. Contractor acknowledges that the Central Pennsylvania Quarry, Stripping and Construction Company is engaged in the stripping of the property *267 for the Coal Company and the Contractor agrees that the rights and privileges granted to the stripping contractor shall have precedence over the rights of the Contractor hereunder. 15. All roads used by the Contractor from the point of auger mining to the tipple shall be maintained at the expense of the Contractor. 16. Contractor shall remove from and along the high wall, at its own cost and expense, any and all material necessary to perform the auger mining hereunder. At the head house the coal produced by petitioners together with that produced by other mine operators was processed in a tipple owned and operated by Westmoreland. The stated price of $2.50 per ton was for coal with less than 7 1/2 percent impurities. Petitioners were not to be paid for coal with impurities in excess of 14 percent. Although the impurities frequently ran over 7 1/2 percent and sometimes over 14 percent, this "reject clause" was never put into effect by Westmoreland which chose, as a matter of business discretion, not to enforce the clause. On December 5, 1955, petitioners moved their old auger (Model 36) to the Hampton mine and began their exploration to determine whether auger mining there was feasible. *268 The coal mined during this initial period was paid for according to the contract. By late February 1956, petitioners were satisfied that their prospects under the contract warranted their purchase of a new auger (Model 48) which was ordered in March, delivered in May and put into operation in June 1956. With the exploration period over, a specific area in the Stockton seam for petitioners' auger mining operation was designated (in February 1956) by Hanlon with Robinson's approval. Westmoreland did not give petitioners the exclusive right to mine the area so designated. In December 1956, Westmoreland became dissatisfied with petitioners' performance, both because of alleged underweight of the truckloads of coal delivered to the head house and because of high percentage of impurities. Robinson stated that he could not accept further coal production under these conditions. Petitioners temporarily stopped production at this point, then, fearing a cancellation of the contract, petitioners wrote to Westmoreland in Philadelphia on December 22, 1956, requesting a meeting "to amend the November 1, 1955 contract we have with yourselves so that it will be possible for us to continue coal mining *269 operations satisfactory to all concerned." As a last alternative, petitioners stated that the letter could serve as its notice of cancellation "if such is necessary." Westmoreland agreed to such a meeting, and it was held on January 8, 1957. At that meeting the differences were resolved and the parties agreed to the continuation of their existing contractual relations. The actual prices per ton paid by Westmoreland for coal delivered at the head house, the retail price of coal sold by Westmoreland and the labor costs (per agreement with the United Mine Workers Union) paid by petitioners varied as follows: Price to
Retail
Labor
Petitioners
Price
Costs
(per ton)
(per ton)
(per day)
Dec. 1955-March 1956
$2.50
x
x
April 1956
2.50
*
80-cent
increase
October 1956
2.70
35-cent
$1.20
increase
increase
April 1957
$2.80-$2.90
*
80-cent
**
increase
September 1958
2.55
Decrease
*
(Amount not
indicated)
The variations (in both *270 directions) in the price received by petitioners did not result from the application of the November 1, 1955, contract or any other contract with Westmoreland, but rather were attributable to business decisions on the part of one party or the other that such changes were expedient to assure continued operation of the mine. Westmoreland's losses and profits on marketing of the coal were not in any way absorbed by petitioners. During the period of several months that a given price to petitioners prevailed (see table above), petitioners' price did not fluctuate according to the retail price which Westmoreland received for a particular order of coal. While petitioners could and did stockpile coal for a short period of time, they never produced further coal when Westmoreland informed them that it had no more orders for processed coal. Petitioners were not permitted to and did not sell any of their produced coal elsewhere. When petitioners completed the mining of the first designated area of the Stockton seam (after a year and a half of operations), other areas were designated by Hanlon for petitioners to develop pursuant to the contract. In preparing to mine a third area (in August 1958) *271 petitioners found it necessary to cut through the side of a mountain at a cost of approximately $100,000 (including depreciation on equipment so used). These costs were deducted on petitioners' 1958 Federal partnership income tax returns. Petitioners, on their partnership returns, took a 10-percent depletion allowance on the gross amounts received from Westmoreland for coal delivered to the head house. Petitioners had no economic interest in the coal in place in the Stockton seam at the Hampton mine. Opinion It is well settled that a taxpayer claiming a depletion deduction under section 611 (including the special percentage depletion of section 613 here sought) [5] must show that he possesses an "economic interest" in the mineral in place. Palmer v. Bender, 287 U.S. 551 (1933); Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25 (1946); Parsons v. Smith, 359 U.S. 215 (1959). Respondent's regulations, [6] *273 supported by these and other cases, have long recognized this principle. It is thus clear that the mere circumstance that a taxpayer derives an economic benefit from contractual relations with the mine owner or lessee does not entitle him to a depletion deduction. Helvering v. Bankline Oil Co., 303 U.S. 362 (1938). *272 Fundamental as these principles might appear, their application becomes rather complicated and uncertain as ingenious taxpayers create infinite patterns of contractual relationships under which natural resources are extracted by a party from lands owned or leased by another. We here bear *274 in mind the astute observation of Justice Frankfurter in his candid dissent in Burton-Sutton Oil Co. v. Commissioner, supra, at pages 37-38: The tortuous process by which the result in this case has evidently to be reached by the Court justifies calling attention again to the present unsatisfactory state of tax litigation. It is of course idle to expect that the complexities of our economic life permit revenue measures to be drawn with such simplicity and particularity as to avoid much litigation. But it is not a counsel of perfection to assume that a system of judicial oversight of fiscal administration can be devised sufficiently rational to avoid the unedifying series of cases relating to income from oil operations culminating, for the present at least, in this case. * * *
Nothing better illustrates the gossamer lines that have been drawn by this Court in tax cases than the distinction made in the Court's opinion between * * * [another oil depletion case], and this case. To draw such distinctions, which hardly can be held in the mind longer than it takes to state them, does not achieve the attainable certainty that is such a desideratum in tax matters, nor does it make generally *275 for respect of law. Perhaps it is inherent in the scheme which Congress has provided for review of tax litigation that we have such an unsatisfactory series of decisions as those which are sought to be reconciled by the present opinion. If so, then the call for legislation voiced in responsible quarters to reform the situation may well be heeded. * * * We now analyze the salient facts which, in terms of the adjudicated standards for defining "economic interest" lead us to conclude that such interest is here absent. We have resolved certain disputed factual issues against petitioners without application of the parol evidence rule which respondent has not pressed upon us and which, in any event, cannot be invoked by the taxing authorities with regard to a contract to which they are not in privity. Haverty Realty & Investment Co., 3 T.C. 161, 167 (1944); Clarence Clark Hamlin Trust, 19 T.C. 718, 724 (1953). However, while we have thus considered petitioners' parol evidence as to conditions qualifying and changing the written contract of November 1, 1955, we are nevertheless convinced that this agreement was effective from that date and embodied the understanding of the parties. We *276 are strengthened in this conviction by the fact that, admittedly, the exploratory period ended in late February 1956. This would encompass approximately a 120-day period if the contract became effective on November 1, 1955. Petitioners' December 1956 letter to Westmoreland referring to the November 1, 1955, contract is also most significant in this regard. In any event, petitioners testified that they signed the contract in late February 1956, at the termination of the 120-day exploratory period. Even under this version of the facts we still must also find that at least by that date the written contract was in effect, [7] for it is clear that this contract expressed Westmoreland's understanding throughout. It is in accordance with the earlier draft prepared by its attorney (except in so far as petitioners had requested changes) and expresses the understanding upon which the parties had informally agreed. Thus, we can attribute no significance to petitioners' contention (even if correct) that the contract was not formally signed on behalf of Westmoreland until January 8, 1957. [8] Furthermore, the document [9] *278 introduced to buttress petitioners' testimony as to the date of Westmoreland's *277 signing completely fails to accomplish its purpose. We accord no greater weight to petitioners' testimony than we do to the document upon which it is based. We are satisfied from the whole record that the January 8, 1957, conference had several purposes and that these did not include the signing of the contract dated November 1, 1955. We according have found that the contract, as written, was effective from November 1, 1955. Turning now to the admissible testimony concerning subsequent oral "modifications," we can perceive no proof that petitioners' price varied directly with the retail price of coal. Raymond testified that the original price ($2.50 per ton) was determined on the basis of a retail price of $3.80 per ton and that petitioner's price was to vary with the retail price in that proportion (i.e. $2.50 / $3.80). Apart from the fact that there were interim retail price variations for which no adjustment appears to have been made, the changes in price which petitioners did receive did not bear the indicated relationship to the retail price. When petitioners received their April 1957 price increase there was no indication of any increase in the retail price. Nor do the other variations appear to be proportional. It seems much more likely to us that the adjustments made to petitioners' price were simply expedient concessions made by one party or the other to avoid cancellation of the contract. This version of the facts is in accord with the testimony of Gallagher which we feel is fully credible. We thus conclude that petitioners received a fixed price per ton *279 rather than a price varying with and dependent upon retail market conditions. This is a strong indication of the absence of an "economic interest." Usibelli v. Commissioner, 229 F. 2d 539, 546 (C.A. 9, 1955), affirming a Memorandum Opinion of this Court; Matagorda Shell Co., 29 T.C. 1060, 1069-1070 (1958); Parsons v. Smith, supra; cf. J. Shelton Bolling, 37 T.C. - (January 16, 1962). In this aspect the instant case is quite different from situations like those present in James Ruston, 19 T.C. 284 (1952), and Commissioner v. Gregory Run Coal Co., 212 F. 2d 52 (C.A. 4, 1954), reversing J. E. Vincent, 19 T.C. 501 (1952). [10]
These above cases also support the proposition that the requisite interest is lacking when the miner cannot sell the coal to third parties. See especially Parsons v. Smith, supra. Here we find a total lack of support for petitioners' assertion *280 that Westmoreland merely had a "right of first refusal." For, whenever Westmoreland informed petitioners that it should cease production, petitioners complied. This strongly suggests that petitioners produced coal only to satisfy actual or potential orders received by Westmoreland. The language of clause 2 of the agreement clearly permits such control by Westmoreland. By means of the 30-day clause, if nothing else, Westmoreland could limit petitioners' production. Petitioners assert that there was a further oral "modification" of the contract in that they were assured that they could mine each area to exhaustion and that the 30-day clause was not intended to be enforced. Petitioners' own letter of December 1956 and the subsequent conference, as well as Westmoreland's action in halting petitioners' production for 6 months in 1958, belie the existence of such an assurance. Nor do we regard Hanlon's testimony to the effect that he "assigned" areas to petitioners as employing a technical use of that term. Rather, we believe the purport to his testimony to be that he "assigned" areas to petitioners only in the sense that work is delegated to employees or independent contractors. Hence, *281 we have used the term "designated" rather than "assigned" in our findings. We are cognizant of the rather large investment which petitioners have made in machinery which is relatively immobile. This circumstance has evidentiary significance in determining (from otherwise ambiguous facts) whether the parties intended the contract to be cancelable on short notice. Stilwell v. United States, 250 F. 2d 736 (C.A. 4, 1957), (where contract was oral and no period of duration was specified). But, here we have a specific, intentionally inserted, provision giving either party the right to cancel. Cf. James Ruston, supra.This provision, as we have seen, served useful purposes on both sides and petitioners as well as Westmoreland appear to have consistently treated it as in effect. We are unconvinced that, contrary to its apparent purposes, it was not intended to be enforced (regardless of petitioners' hopes that the contract would continue until the mine was exhausted). This additional circumstance, the lessee's right to cancel on short notice, again affords a strong indication that the requisite interest is absent. Usibelli v. Commissioner, supra; Parsons v. Smith, supra; cf. Utah Alloy *282 Ores, Inc. 33 T.C. 917, 922 (1960). Considered together with our conclusion as to the manner of determining petitioners' price and the absence of a right in petitioners to sell elsewhere, it convinces us that petitioners did not look to the severance and sale of the coal to recover their investment. Rather they relied on the personal covenant of Westmoreland for such recovery. Accordingly, we hold that they lacked an "economic interest" in the coal in place. Petitioners argue that the cases often emphasize the substantial investment in equipment, exploration and development made by the miner as support for the conclusion that such miner possesses an economic interest. See e.g., James Ruston, supra; Commissioner v. Gregory Run Coal Co., supra. But this is just one of numerous factors, and we are aware of no case in which this has been given anything approaching controlling significance. To the contrary, the recent decision in Parsons v. Smith, strongly suggests that the only investment of any independent significance under the regulations [11] is that in costs which are not currently deductible through depreciation or otherwise. [12] Here, the auger can be depreciated over its useful *283 life, now conceded by respondent to be 4 years, and petitioners have shown no reason why the exploration costs could not have been deducted (under section 615) in the year incurred. Likewise, it appears that petitioners were entitled to (and did) deduct the expenses of cutting through the mountain in the year incurred under sections 162, 167, or 616. We have devoted substantial discussion to this (investment) phase of this case because petitioners sincerely urge that this is a difference of consequence, in terms of the nature and amount of the investment involved, between strip and auger mining. We recognize the differences in these two method of mining (see footnote 3, supra) and certainly, as we have mentioned above, the nature of *284 the investment is of significance in construing the contract. However, its is but one of several criteria to be considered in ascertaining whether an "economic interest" exists. Parsons v. Smith, supra.In light of our finding as to the terminability of the contract here at issue and the absence of the other accepted indicia of "economic interest," we do not feel that, consistent with the Parsons case, we can treat this one factor as outweighing the others discussed so as to permit a conclusion that an investment in the mineral in place has occurred. We do not hold that under no circumstances may this inherent difference in the nature of auger mining, as opposed to strip mining, be crucial. We simply hold that it is not enough to change our conclusion under the facts of record in this case. The additions to tax under section 6654 can be computed in accordance herewith, such addition being automatic if there is an underpayment of estimated tax liability as defined by section 6654(b). To give effect to respondent's concessions, Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Wilfred N. Desrosiers, Docket No. 82008; Leo C. Desrosiers and Norma Desrosiers, Docket No. 82009; Ernest A. Desrosiers and Faye I. Desrosiers, Docket No. 82010; and Albert C. Desrosiers and Isabelle L. Desrosiers, Docket No. 82011.↩
2. Unless otherwise noted, all Code references are to the Internal Revenue Code of 1954.↩
3. Owners (or lessees) of coal lands often decide that auger mining operations may be profitable on their properties after a strip-mining operation has been completed or while it is in progress. Auger mining is a far more technologically advanced method of extracting coal than is strip mining. Auger mining also makes possible the extraction of greater quantities of coal and generally yields a better-grade product. These advantages may more than offset the greater cost of this method arising from the use of machinery which is more expensive and less flexible than that used in strip mining.
4. The record is silent as to the tax treatment which petitioners gave to these expenditures or as to whether the figure includes depreciation on fixed assets (deducted on the returns) as well as out-of-pocket expenses.
x. Not available. ↩
*. No change indicated by the record. ↩
**. The mine was closed from March to September 1958 because Westmoreland informed petitioners that it could then accept no more coal. Finally, in September 1958, petitioners accepted the indicated decrease in price in order to be able to resume operations.↩
5. SEC. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION. (a) General Rule. - In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion * * * SEC. 613. PERCENTAGE DEPLETION. (a) General Rule. - In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section. (b) Percentage Depletion Rates. - The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows: * * *
(4) 10 percent * * * coal * * * ↩
6. § 1.611-1 [Income Tax Regs.] Allowance of deduction for depletion. - * * *
(b) Economic interest. (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital interest in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter * * * to compensation for extraction * * * does not convey a depletable economic interest. * * *
7. We are not at all persuaded by petitioners' explanation that they signed the contract on this date only "to satisfy the Philadelphia office." We believe that petitioners misunderstood the "assurances," which Robinson allegedly gave them when they signed. Nor, under familiar contract principles, is the subjective intent of one of the parties to the contract material to an interpretation of its terms. ↩
8. Even this argument would seem to admit the contract (with possible oral modifications) was in effect during 1957, the second of the tax years at issue. ↩
9. The page in Raymond's diary for January 8, 1957, reads simply as follows: Blue grey sta. wagon comes up to insp. top seam - prob. Mining crowd. Had meeting [with] Messrs. Gallagher, Robinson, Sutton & 3 of us at Westmoreland mine office rather than meet tomorrow.
10. Both decisions were rendered prior to Parsons v. Smith, supra.↩ It is at least arguable that in the light of Parsons v. Smith, these two cases would now be decided contrary to the taxpayer's contentions because of the right of either party to cancel on short notice. See Walter Bernard McCall, 37 T.C. - (January 12, 1962).
11. See footnote 6, supra. ↩
12. This theory would appear consistent with the Supreme Court's explanation in Commissioner v. Southwest Expl. Co., 350 U.S. 308, 312 (1956): * * * this exclusion [depletion allowance] is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired. * * * [This language was quoted with approval in Parsons v. Smith, 359 U.S. 215, 220↩.]