JOHNNIE W. HARRIS and MARY B. HARRIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harris v. Commissioner
Docket No. 1019-74.
United States Tax Court
T.C. Memo 1977-222; 1977 Tax Ct. Memo LEXIS 218; 36 T.C.M. (CCH) 925; T.C.M. (RIA) 770222; July 18, 1977, Filed *218 Respondent reconstructed petitioners' income using the net worth plus nondeductible expenditures method. Petitioners agree with all figures used in respondent's computations except the figures for cash on hand. Held, petitioners' cash on hand at the close of the years 1966, 1967, 1968, 1969, and 1970 determined. Johnnie W. Harris, pro se. Eric B. Jorgensen, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1967 through 1970 plus additions to tax under section 6653(a) as follows: Year
Deficiency
Addition to Tax
1967
$2,500.07
$125.00
1968
3,218,94
160.95
1969
2,339.23
116.96
1970
2,701.15
135.06
Respondent reconstructed petitioners' income for the years in question using the net worth plus nondeductible expenditures method. Petitioners do not dispute any of the figures used in respondent's computation other than the figures for cash on hand at the close of the relevant years. After concessions by both parties, the issues remaining for decision are the amounts of petitioners' cash on hand at the close of years 1966, 1967, 1968, 1969, and 1970, whether the imposition of *219 the negligence penalty is appropriate for each of the years in issue, and whether respondent is barred from assessing deficiencies for the years 1967 and 1968 by the statute of limitations. FINDINGS OF FACT Most of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners Johnnie W. Harris and Mary B. Harris, husband and wife, resided in Winterville, N.C., at the time of filing the petition herein. For the taxable years 1965 and 1966 petitioners timely filed joint income tax returns with the District Director, Internal Revenue Service, Greensboro, N.C. For the taxable years 1967 through 1970 petitioners timely filed joint income tax returns with the Director, Internal Revenue Service Center, Chamblee, Ga. Petitioners at all times used the cash receipts and disbursements method of accounting. The parties agree that all the deductions taken by petitioners on their joint returns for 1967 through 1970, including deductions for business expenses and other itemized expenses, are allowable deductions for purposes of this case and are neither understated nor overstated. During the years *220 1965 through 1970 petitioners continuously owned and maintained a joint checking account at the Bank of Winterville, Winterville, N.C. The balances in such account at the close of those years were as follows: Year Ended December 31
Balance
1965
$ 144.55
1966
1,534.84
1967
1,227.66
1968
2,820.07
1969
5,255.70
1970
2,057.89
During the years 1965 through 1970 petitioner Mary B. Harris continuously owned and maintained a checking account in her name at the Bank of Winterville, Winterville, N.C. The balances in such account at the close of those years were as follows: Year Ended December 31
Balance
1965
$ 838.10
1966
963.36
1967
908.86
1968
962.87
1969
1,323.23
1970
1,168.10
During the years 1965 through 1970 petitioners continuously owned and maintained a joint savings account at First Federal Savings and Loan Association, Ayden, N.C. The balances in such account at the close of those years were as follows: Year Ended December 31
Balance
1965
$6,172.35
1966
6,438.87
1967
1.00
1968
1.00
1969
1.00
1970
1.00
During the years 1965 through 1970 petitioners continuously owned and maintained a joint savings account at First Federal Savings and Loan Association, Greenville, N.C. The balances in such account at the close of those *221 years were as follows: Year Ended December 31
Balance
1965
$ 758.62
1966
4,880.72
1967
5.15
1968
5.15
1969
5.15
1970
5.15 During the years 1967 through 1970 petitioners continuously owned and maintained a joint savings account at Home Savings and Loan Association, Greenville, N.C. The balances in such account at the close of those years were as follows: Year Ended December 31
Balance
1967
$1,966.59
1968
2,051.52
1969
1,961.21
1970
1,030.88
During the years 1968 and 1969, petitioners continuously owned and maintained a joint savings account at Planters National Bank & Trust Company, Greenville, N.C. The balances in such account at the close of those years were as follows: Year Ended December 31
Balance
1968
$ 40.12
1969
679.21
Set forth below is a schedule which reflects the certificates of deposit which the petitioners owned during the years 1967 through 1971: BANK OF WINTERVILLE WINTERVILLE, N.C. Date
Date
Date
Interest Number
Amount
Purchased
Due
Cashed
Rate
243
$ 7,000
1-4-67
7-4-67
1-4-68
5.00%
301
8,000
4-4-67
7-4-67
1-21-70
5.00% 364
15,000
10-30-67
4-30-68
5-7-70
5.00%
410
7,000
1-4-68
4-4-68
4-13-68
5.00%
1031
10,000
1-4-71
1-4-73
1-4-74
5.75%
PLANTERS NATIONAL BANK & TRUST COMPANY GREENVILLE, N.C. Date
Date
Date
Interest Number
Amount
Purchased
Due
Cashed
Rate
766
$10,000
9-26-68
12-26-68
3-31-70
5.00%
During *222 the years 1965 through 1971 petitioners owned debentures and stock in FCX, Inc., as follows: FCX, Inc., Debentures Cert.
Date
Date No.
Purchased
Type
Amount
Sold
97
12-17-58
Series 1969 Debenture
$2,000
1-10-69
105
12-17-58
Series 1969 Debenture
2,500
1-10-69
Total Cost of Debentures
$4,500
FCX, Inc., Stock
10692
12-5-60
Class "C" Preferred
$ 2,500
2891
6-28-61
Class "E" Preferred
300
3785
11-8-61
Class "E" Preferred
6,000
6634
10-24-63
Class "E" Preferred
10,000
7975
12-17-64
Class "E" Preferred
5,000
12594
7-12-66
Class "C" Preferred
7,000
Total Cost of Stock
$30,800
Set forth below is a schedule reflecting the rate and amount of annual dividends paid by FCX, Inc., from 1965 through 1971 on stock owned by petitioners and listed in the preceding paragraph: Rate of
Dividend Year
Dividend
Paid
1965
5%
$1,074.72
1966
5%
1,190.00
1967
5%
1,540.00
1968
5%
1,540.00
1969
5%
1,540.00
1970
6%
1,848.00
1971
6%
1,848.00 Petitioners did not report the $1,540 of dividends received in 1967 on their tax return for that year. Set forth below is a schedule reflecting the rate and amount of interest paid by FCX, Inc., from 1965 through 1968 on debentures owned by petitioners and listed in the second preceding paragraph: Rate of Interest Year
Interest Paid
1965
5% $225
1966
5%
225
1967
5%
225
1968
5%
225
Petitioners *223 did not report the $225 of interest received in 1967 on their tax return for that year. During the years 1965 through 1972 petitioners bought and sold the following securities: Date
No. of
Total
Securities'
Date
Sales Purchased
Shares
Cost
Name
Sold
Proceeds
1-3-67
100
$1,575.00
Hardees Food Systems
3-22-67
$2,162.50
3-22-67
144
2,160.00
Leverage Fund of
11-12-68
1,226.72
Boston, Inc.
(100 sold)
11-12-68
532.38
(44 sold)
11-14-68
60
1,671.50
Pyle National Company
5-26-72
2,645.28
merged with Harvey
Hubbell, Inc., in 1970.
Petitioners received 36
shares of Harvey Hub-
bell, Inc., in exchange
for their 60 shares of
Pyle Nat'l Company.
1-26-71
200
900.00
Lynch Corporation Petitioners did not report the gain from the sale of 100 shares of Hardees Food Systems on their tax return for 1967. During the years 1965 through 1970 petitioners owned the farm assets listed below at their cost basis on December 31 of each of those years: Farm Assets
Years Ended December 31
1965
1966
1967
1968
1969
1970
Building
$3,000
$3,000
$3,385
$3,385.00
$3,385.00
$3,385.00
Drainage Tile
346
346
734
734.00
734.00
734.00
Truck
1,500
1,500
1,500
1,500.00
1,500.00
1,500.00
Truck
(1967 model)
--
2,562
2,562
2,562.00
2,562.00
2,562.00
Car
(1969 model)
--
--
--
--
3,200.00
3,200.00
Tractor (used)
--
--
--
2,390.67
2,890.67
2,890.67
Total
4,846
$7,408
$8,181
$10,571.67
$14,271.67
$14,271.67
In *224 1970 petitioner Johnnie W. Harris purchased from his brothers and sisters their interests in the family's farm. Listed below are the dates and amounts of money paid by check to Mr. Harris' brothers and sisters for their interests: Date
Amount
Payee
1-15-70
$ 6,500
Ernest Harris
1-15-70
1,500
Lester Ray Harris
1-15-70
6,500
Hazel Anderson
1-15-70
6,500
Alma Harris Thorne
Total
$21,000 In 1969 and 1970 petitioner Johnnie Harris constructed his own residence at a total cost of $20,000. He spent approximately $5,000 on the construction in 1969 and $15,000 in 1970. In 1967 petitioners purchased a television set at a cost of $628.30 which they continuously owned through December 31, 1970. On December 31 of each of the years 1966 through 1970 petitioners had a total reserve for depreciation as follows: Year Ended December 31
Amount
1966
$1,227.68
1967
1,730.17
1968
2,732.86
1969
3,435.55
1970
4,638.24
During the years 1967 through 1971, inclusive, petitioners borrowed money from the Bank of Winterville, Winterville, N.C., as follows: Date
Date
Amount
Interest Amount
Made
Paid
Paid
Rate
$ 1,000
2-16-67
4-4-67
In Full
6.0%
500
6-10-67
9-5-67
In Full
6.0%
3,000
12-27-67
4-13-68
In Full
6.0%
1,500
1-18-68
4-13-68
In Full
6.0%
1,300
2-23-68
10-15-68
In Full
6.0%
995
1-23-69
9-10-69
In Full
6.0%
6,000
7-9-69
9-10-69
$3,467.52
6.0%
9-13-69
2,532.48
6.0%
15,000
1-21-70
5-7-70
In Full
7.0%
1,000
5-6-71
9-8-71
In Full
6.5%
4,500
7-1-71
10-2-71
In Full
7.5%
5,000
7-27-71
8-6-71
In Full
7.5%
*225 During 1969 petitioners purchased from Pinner-White Chevrolet, Inc., a new car at a cost of $3,876. Petitioners were allowed a trade-in value on their old car in the amount of $676. They made a cash down payment in the amount of $2,140.40 and gave their personal note in the amount of $1,059.60 for the balance. They paid their personal note in full in 1970. During the years 1967 through 1970 petitioners incurred personal living expenses in the following amounts: Year Ended December 31
Amount
1967
$6,000
1968
6,000
1969
6,000
1970
6,000
During the years 1968 through 1970 petitioners made deductible charitable contributions in the amounts set forth below: Year Ended December 31
Amount
1968
$2,500
1969
3,300
1970
2,000
The parties agree petitioners are entitled to additional depreciation deductions for the years 1966 and 1967 in the amounts of $125 and $500, respectively, for depreciation on petitioners' truck purchased in 1966. In 1967 and 1968 petitioners received taxable dividends from their stock in the Leverage Fund of Boston, Inc., in the amounts of $63 and $103.56, respectively. Such amounts were not reported by petitioners on their income tax returns for those years. Petitioners did not *226 file any North Carolina intangible property tax return for the years 1960 to 1971, inclusive. Throughout the years in issue and for about 15 years prior thereto, Mr. Harris was engaged in tobacco farming. Most of his income from farming was derived during the fall of each year when the tobacco crop was harvested and sold. Many of Mr. Harris' business transactions were conducted in cash, although checks were also used. Petitioners did not retain any books or records of their income or expenses during the years in issue. While records were kept during the course of each year, such records were destroyed as soon as petitioners' income tax returns were filed. No books or records of petitioners' income or expenses were shown to respondent during audit, nor placed into evidence at trial. In the notice of deficiency respondent determined petitioners had cash on hand in the following amounts: Year Ended
Amount
12-31-66
$10,000
12-31-67
0
12-31-68
0
12-31-69
0
12-31-70
10,000
Respondent relies on the six-year statute of limitations in section 6501(e)(1)(A) [1] *227 to assess deficiencies for the calendar years 1967 and 1968. ULTIMATE FINDINGS OF FACT Petitioners' cash on hand at the end of the calendar years 1966 through 1970 was as follows: Year Ended
Amount
12-31-66
$10,000
12-31-67
0
12-31-68
0
12-31-69
3,500
12-31-70
10,000
OPINION The issues we must decide are the amounts of petitioners' cash on hand at the close of the calendar years 1966, 1967, 1968, 1969, and 1970, whether the imposition of the penalty provided in section 6653(a) is appropriate for any of the years in issue, and whether respondent is barred from assessing deficiencies for 1967 and 1968 by the statute of limitations. Petitioners claim to have had large amounts of cash on hand (as much as $60,000) prior to and during the years before us. They claim these large amounts of cash were concealed in a secret hiding place at their home. Although approximately $30,000 cash was used to purchase FCX, Inc., stock during the years 1960 through 1966, petitioners assert they always had at least $30,000 cash on hand at year's end from 1966 through 1969. During 1970 this $30,000 was allegedly expended to purchase and improve farm property belonging to Mr. Harris' brothers and sisters, leaving zero cash on hand at the *228 close of that year. Respondent contends petitioners had no more than $10,000 cash on hand on December 31, 1966, and no cash on hand whatever on December 31, 1967, 1968 and 1969. Respondent says petitioners again had $10,000 cash on hand on December 31, 1970. Petitioners have the burden to show respondent's determinations are erroneous. Welch v. Helvering,290 U.S. 111 (1933). They have relied almost exclusively on the testimony of Mr. Harris to carry that burden. Mr. Harris testified he kept large amounts of cash on hand in order to avoid borrowing from banks and paying interest. However, when he finally purchased the farm property he long desired he used $15,000 of borrowed funds to do so. In addition petitioners borrowed over $14,000 from the Bank of Winterville during the years 1967 through 1969. We believe petitioners did have sizeable amounts of cash on hand from time to time prior to and during the years before us, but we are not convinced they had anything close to $30,000 at the end of any of the years in question.[2]
Respondent *229 determined that petitioners had $10,000 cash on hand on December 31, 1966. This determination is based on the fact that petitioners purchased a $7,000 certificate of deposit (certificate number 243) and made a $3,000 cash deposit in their joint checking account on January 4, 1967. Since respondent was unable to determine the origin of these funds, he assumed they represented cash on hand at the close of the preceding year. Petitioners do not dispute respondent's assumptions, but they contend a greater amount of cash on hand existed. While respondent's reasoning behind his determination in the notice of deficiency does not foreclose the possibility of greater cash on hand at the end of 1966, petitioners have failed to convince us that any greater amount existed. Consequently, respondent's determination for that year is sustained.[3] *230 The years 1967 and 1968 present similar problems because of the paucity of evidence presented. The only evidence in the record of any cash on hand at the close of those years is Mr. Harris' general testimony to that effect.We find such testimony unpersuasive. There is no doubt Mr. Harris conducted much of his business in cash. However, where the cash came from and where it went is anybody's guess. Indeed, Mr. Harris indicated at trial that he could not remember the particulars of many of his dealings. The record before us is wholly inadequate to trace the funds used or earned in the farming business during those years, and therefore, we again sustain respondent's determination. Petitioners' folly is their failure to carry their burden of proof. Welch v. Helvering,supra.
Mr. Harris testified he was saving $30,000 throughout the years in issue to purchase farm property from his brothers and sisters, and that the $30,000 was in fact expended *231 in 1970 to purchase and improve such property. The farm actually cost petitioners $21,000 and was purchased on January 15, 1970. The purchase price was paid by four checks written to Mr. Harris' brothers and sisters. Petitioners' checking account showed a balance on December 31, 1969, of $5,255.70. By January 19, 1970, the balance in the account was reduced to $1,647.98. None of the checks written for the farm property had been cashed as of the latter date. The first deposit in the checking account in 1970 came on January 21, 1970, in the amount of $23,000, and was made, we believe, to cover the cost of the farm. The deposit slip for the $23,000 indicates that the deposit represented the proceeds of a loan for $15,000 taken out that same day and a certificate of deposit (certificate number 301) for $8,000 cashed that day. The certificate of deposit had been purchased by petitioners on April 4, 1967. It thus appears that no portion of the $23,000 deposit came from the $30,000 petitioners allege they maintained for a number of years in order to purchase the farm. Moreover, the loan for $15,000 taken out on January 21, 1970, was paid in full on May 7, 1970. On the latter date *232 Mr. Harris cashed a certificate of deposit (certificate number 364) in the amount of $15,000. Mr. Harris indicated at trial that the loan was taken out because the certificate of deposit had not yet matured, but that when the certificate did mature he cashed it immediately and used the proceeds to pay off the loan. While the maturity date is somewhat at odds with the stipulated facts, the record otherwise supports Mr. Harris' testimony that the loan was paid off with money held in the bank on December 31, 1969, and not from cash on hand. A second deposit was made in the checking account on February 25, 1970, in the amount of $3,500. The deposit slip indicates the deposit was made in cash. On the same day of the deposit, a check for $6,500 was debited from the account leaving a balance after both transactions of $982.87. We believe a reasonable inference can be drawn from the record herein that the $6,500 check was one (and perhaps the last) of the checks written to Mr. Harris' brothers and sisters to purchase the farm property. Consequently, a small portion of the purchase price of the farm property did come from cash. But because the majority of the money used to purchase the *233 farm in fact came from a cashed certificate of deposit and a loan, we do not believe Mr. Harris' testimony that he maintained $30,000 cash on hand at the close of 1969 to purchase the farm. There is no evidence in the record bearing directly on the source of the $3,500 cash deposit. Mr. Harris did testify generally that the income from his farm was all realized during the fall of each year, and that cash deposits made prior to fall had to come from cash on hand at the close of the preceding year. A review of petitioners' bank records indicates that no withdrawals were made from savings nor were any certificates of deposit cashed between January 1 and February 25, 1970, other than the $8,000 certificate mentioned earlier and accounted for. Similarly, no funds were borrowed from the bank during this same period other than the $15,000 loan mentioned previously and accounted for. Although the evidence presented is not particularly strong, we believe that the $3,500 cash deposit did come from cash on hand at the close of 1969.However, from the record before us we are unable to conclude that petitioners held any greater amount of cash on hand at that time than $3,500. On January 4, 1971, *234 petitioners purchased a certificate of deposit (certificate number 1031) for $10,000. Since respondent was unable to determine the source of these funds he assumed the amount represented cash on hand at the end of 1970. Although petitioners contend they had no cash on hand, since their accumulated cash was spent to purchase, improve, and furnish the farm property, the record (as we have pointed out) does not support their conclusion. It is true that petitioners made substantial expenditures in 1969 and 1970 to purchase and improve the farm property. However, we believe much of the money used for this purpose came from sources other than cash on hand. There is virtually no indication in the record where the $10,000 used to purchase the certificate of deposit on January 4, 1971, came from. Under the circumstances we do not think respondent's assumption that the $10,000 represented cash on hand at the end of 1970 was unreasonable. Petitioners have again failed to carry their burden to show respondent's determination is erroneous, and accordingly, respondent is sustained.
The next issue before us is whether any portion of the under payment of tax in each of the years in issue is due *235 to the negligent or intentional disregard of rules and regulations under section 6653(a). Petitioners have the burden to show that respondent's imposition of the negligence penalty is unwarranted. Vaira v. Commissioner,52 T.C. 986, 1004 (1969), reversed and remanded on other grounds 444 F. 2d 770 (3d Cir. 1971). Initially, we note that petitioners have failed to comply with the record keeping requirements of section 6001 and the regulations thereunder. See section 1.6001-1(b), Income Tax Regs.; Meneguzzo v. Commissioner,43 T.C. 824, 832 (1965). The absence of adequate books and records certainly supports respondent's determination. [4] Moreover, here there has been no good faith attempt at compliance with the statutory mandate. [5]
We are not inclined to believe that petitioners intentionally disregarded the record keeping requirements of the Internal Revenue Code. However, petitioners have failed to provide us with any credible evidence justifying their failure to maintain adequate books *236 and records, and consequently, the evidence presented is insufficient to overcome the presumption favoring a finding of negligence. [6] Accordingly, respondent's determination must be sustained for each of the years in issue. The final issue presented is whether assessments for the years 1967 and 1968 are barred by the statute of limitations. [7] The notice of deficiency for those years was mailed on November 20, 1973, more than three years after the returns were filed. Respondent relies on section 6501(e)(1)(A) to justify his proposed assessments. Although petitioners have the burden of refuting respondent's determination regarding the amounts of deficiencies for the years in issue, respondent bears the burden of showing petitioners omitted amounts of gross income in excess of 25 percent of the gross income stated in their returns. Stratton v. Commissioner,54 T.C. 255, 289 (1970). *237 We must, therefore, analyze the evidence in the record from a different perspective to see whether respondent's burden has been met. Most of the figures used in respondent's computation have been stipulated to and will be used in our analysis. The only disputed figures are the amounts of cash on hand at the close of the years 1966 through 1970. Petitioners reported gross income in their returns for 1967 and 1968 in the amounts of $18,755.60, and $21,429.98, respectively. Accordingly, respondent must show respective omissions from gross income in excess of $4,688.90 and $5,357.50 for those years. Although the net worth method of reconstructing income may result in a greater net income than reported on the returns, it does not necessarily follow that the amount of increase was gross income omitted from the return. This is so because such increase may be attributable to disallowed deductions. See Hurley v. Commissioner,22 T.C. 1256, 1265 (1954), affd. per curiam 233 F. 2d 177 (6th Cir. 1956). However, in our case the parties have stipulated that the deductions taken in the returns are all allowable and neither understated or overstated. We believe, therefore, that the respondent *238 has carried his burden to show that any unreported net income in the present case is a consequence of petitioners' omissions of gross income from their returns. Accordingly, we may "equate" unreported net income with an omission from gross income for purposes of this opinion. Courtney v. Commissioner,28 T.C. 658, 668 (1957). A detailed analysis of the evidence and respondent's net worth computation is unnecessary. For even if we adopt the cash on hand figures urged upon us by petitioner, the unreported net income (and, consequently, unreported gross income) for 1967 and 1968 exceeds 25 percent of the gross income reported in their returns for those years. It follows that respondent is not barred from assessing deficiencies for 1967 and 1968 by the statute of limitations. Decision will be entered under Rule 155. Footnotes
1. All statutory references herein refer to the Internal Revenue Code of 1954, as in effect for the years in issue.
2. Indeed, Mr. Harris testified he periodically used some of the $30,000 in his farming business, although he claims the amounts were always restored.↩
3. It may be reasonable to infer (in light of petitioners' propensity for cash transactions) that small sums of money were kept around the house at all times and that petitioners did not deposit all of their available cash in the bank on January 4, 1967. However, such an inference can be made for all the years in question, and adding identical amounts to respondent's determinations for each of the years would result in no change in tax (i.e., the changes in net worth over the years in issue would remain the same). Accordingly, such nominal amounts may be ignored for purposes of this opinion.
4. Washburn v. Commissioner,44 T.C. 217, 225↩ (1965). 5. Petitioners acknowledge they routinely destroyed all their books and records immediately after filing their tax returns for the years in issue.↩
6. Petitioners also failed to include certain dividends, interest, and capital gain income in their tax return for 1967. See our findings of fact, supra.↩ Such omissions support a finding of negligence for that year.
7. The period of assessment for the year 1969 was extended by agreement and is not in dispute. See section 6501(c)(4).↩